Herman H. ARMBRISTER, et al., Plaintiffs,

v.

ROLAND INTERNATIONAL CORP., et al., Defendants.

No. 84–1115–CIV–T–17.

United States District Court, M.D. Florida, Tampa Division.

Aug. 14, 1987.

John A. Bussian, Miami, Fla., Richard F. McMenamin, Philadelphia, Pa., for plaintiffs.

Sylvia H. Walbolt, Alan C. Sundberg, Tampa, Fla., for defendants.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

KOVACHEVICH, District Judge.

This cause is before the Court on motions for summary judgment filed by Defendants, and on Plaintiffs' responses thereto. The motions and responses are accompanied by numerous exhibits, affidavits, and depositions, which have been made a part of this record. Hearing was held before this Court on all summary judgment issues on July 19, 1987.

Two years ago, Defendants moved for partial summary judgment. On June 18, 1985, this Court determined that all material facts had not been established, and denied the motion, "subject to renewal when deemed appropriate." By subsequent order of the Court, discovery was limited to the statute of limitations issues. Discovery on those issues is now concluded. Because there are fifteen named Plaintiffs, there are fifteen separate motions for summary judgment. However, the basic underlying issues are the same as to each element of the complaint.

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. The Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 996–97, (5th Cir.1979), quoting *Gross v. Southern Railroad Co.*, 414 F.2d 292 (5th Cir.1969). Factual disputes preclude summary judgment.

The Supreme Court of the United States held, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986),

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.*, 477 U.S. at ——, 106 S.Ct. at 2552–53, 91 L.Ed.2d at 273.

The Court also said, "Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a

genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at p. ——, 106 S.Ct. at p. 2553, 91 L.Ed.2d at p. 274. After careful evaluation of all of the motions, responses, and exhibits, this Court finds that there are no genuine issues of fact left for determination by a jury, and that summary judgment as to all but Count X of the complaint should be *granted* based on application of the relevant statutes of limitation.

### GENERAL FINDINGS OF FACT

This action was filed August 16, 1984. In question are interstate land sales of parcels in three properties in Florida: Flagler Estates, Orlando Pines, and Imperial Acres. Plaintiffs allege that Defendants engaged in a scheme to defraud them by misrepresenting the nature and value of the land that they were buying. Plaintiffs were approached and sold their land by sales representatives of Defendants, usually through the use of direct mail advertising and telephone solicitation. Most Plaintiffs never actually saw the property that they bought. Most of the land sales occurred in the early or mid–1970's, although Plaintiffs continued making payments on the land long after the initial contract date. (Defendants' Ex. A).

Defendant Roland International Corporation is a Delaware corporation licensed in the State of Florida. Defendants Florida Leisure and Florida General are Florida corporations. Defendants Joel Friedland, Gerald Robins, and Howard R. Scharlin are individuals who were and are officers and directors of the corporate Defendants at all times relevant to this action.

Defendants are not, and never were, in a fiduciary relationship with Plaintiffs. Defendants were the sellers of the properties in question, and Plaintiffs the buyers. Consequently, the transactions involved were *clearly arms length transactions*, and being such, the buyers had a duty to protect their own interests. Sellers did not have special knowledge of the property peculiar only to sellers. A mimimal inquiry by the buyers would have disclosed all facts relevant to the land in question. The law is designed to protect the interests of all citizens. However, the Court cannot insulate individuals from their own stupidity.

### FACTS REGARDING FLAGLER ESTATES

Flagler Estates consists of acreage in St. Johns County, Florida. The sales contracts for this property, as with all properties involved, were accompanied by a Florida Public Offering Statement, which purchasers were required to read and sign. (Florida Public Offering Statement, Plaintiffs' Ex. A). A signed receipt, acknowledging that buyer had read the statement, was required to be returned to the seller with the contract. Most sales of property in Flagler Estates took place in 1971 and 1972.

The Public Offering Statement which accompanied sales of Flagler Estates disclosed the following:

1. Flagler Estates is not a recorded subdivision nor is it part of a recorded plat.
2. This is not a homesite offering.
3. The property being offered hereunder is currently encumbered by mortgages.
4. No provision has been made for sewage. This is not a homesite offering.
5. No provision has been made for water supply. This is not a homesite offering.
6. No provision is made for public utilities. This is not a homesite offering.
7. The purchaser should ascertain for himself that the property offered meets his personal requirements and expectations, misunderstandings as to the desirability of the property may arise when the purchaser fails to understand the nature of the property offered.

All Plaintiffs who purchased land in Flagler Estates signed and returned the receipt portion of the Florida Public Offering Statement, which contained the above caveats.

On the back of the sales contract itself appears the following. "This purchase agreement and attached legal description, constitute the entire agreement and the

Purchaser acknowledges that no additional representations have been made."

The contract also included a guarantee that purchaser or his agent could inspect the property within six months of purchase and obtain a refund if not satisfied.

## FACTS REGARDING ORLANDO PINES

Orlando Pines consists of unimproved acreage in Polk County, Florida. Sales in this area were made in 1970—1975. The Public Offering Statement which accompanied all sales of land in this parcel contained the following warnings, which appeared in a paragraph on the very front page, in large red capital letters. (Plaintiffs' Ex. B).

This property is not useful for building purposes. It is unimproved property, unsurveyed and without roads, drainage, or other improvements. Seller is not obligated to provide any improvements. 35% is marsh or swampy. It is located in an area known as Green Swamp and is subject to flooding. The County ... has not promised or agreed and does not intend to provide streets, drainage, water, utilities or any other improvements to this land.

The Statement went on to disclose the following:

1). The property is currently encumbered by several mortgages.

2). Physical access to each individual tract is not provided.

3). As much as 35% of the tracts being offered may be covered with water during all or substantially all times of the year.

4). Approximately 15% of the tracts being offered have muck or peat to an average depth of 2 feet.

5). There are no streets, sewers or other water facilities and none are planned.

On the last page, in large black capital letters, appeared the following notice to purchasers.

**The purchaser should ascertain for himself that the property offered meets his personal requirements and expectations. Misunderstandings as to the de-sirability of the property may arise when the purchaser fails to understand the nature of the property offered or the terms of the contract.**

The large red paragraph already quoted appears *twice* in the Statement; once on the front page, and once directly above the receipt attesting that the buyer had read the Statement, which buyer was required to send back to seller with the sales contract.

In bold, black letters on the last page, appear the following. **BE SURE AND READ YOUR CONTRACT BEFORE YOU SIGN** and also the sentence **DO NOT SIGN UNLESS YOU HAVE READ THE OFFERING STATEMENT.**

All Plaintiffs who purchased land in Orlando Pines signed and returned the receipt indicating they had read the Florida Public Offering Statement, which contained the above caveats.

Upon the face of the sales contract itself appears the following, in large bold black letters.

**This property is unimproved unsurveyed acreage without physical access to each individual tract; without drainage or other improvements. 35% is marsh or swampy and is subject to flooding.**

On the back of the contract appears the following. "This purchase agreement and attached rider(s) if any, constitute the entire agreement and the Purchaser acknowledges that no additional representations have been made."

## IMPERIAL ACRES

Imperial Acres consists of acreage in Polk County, Florida. Sales in this area were made to all but one Plaintiff in 1977. (Plaintiff Gagnier made a purchase in 1973). The Public Offering Statement for Imperial Acres contained the following, in large red capital letters on the front page. (Plaintiffs' Ex. C).

... The property described herein is not suitable for building purposes. It is unimproved, unsurveyed acreage without roads, drainage, or other improvements.

35% of the property is swampy bayhead, and is subject to flooding. The seller is not obligated to provide any impovements.... All mineral rights ... have been reserved ... Polk County, Florida has not promised or agreed and does not intend to provide streets, drainage, water, utilities or any other improvements to this land.

On the front page, in the same large red letters, appeared a warning titled "Notice to Purchasers", which states that the Federal Trade Commission (FTC) had investigated the sales practices of the developer, and that a consent order had been entered stating, among other things, that "the developer agrees not to use unfair and deceptive sales practices"! Later in the Statement, under the section titled Governmental Control, the terms of the Consent order are discussed, including developer's agreement to cease and desist from representing the purchase of land as a safe investment, or that the developer will buy back or resell lots for the buyers, etc. (Section titled Governmental Control).

The Statement went on to disclose the following:

1). Imperial Acres is encumbered by two mortgages.

2). Physical access to each individual parcel is not provided.

3). 35% of the tracts being offered for sale are considered swampy bayhead and are subject to flooding.

4). Portions of Polk County have been designated as flood prone ... the Green Swamp regulations currently in existence have designated a miniumum of one foot above flood level for flood elevation in the area.

5). No improvements exist at Imperial Acres, and none are promised or planned.

6). Water facilities are not provided.

7). There is no provision for sewage disposal.

8). There are no drainage facilities at the subdivision, and none are planned.

9). ... (the state authorities) have the right to condemn any part of the lands being offered hereunder ... (the land) has been designated by the State of Flor-

ida as an area of critical State concern, which will limit any development.

10). The future value of any land is very uncertain; do NOT count on appreciation.

11). The developer does not engage in reselling the purchaser's property and makes no representation regarding the purchaser's ability to resell his property at any time in the future.

12). Changing land development and land use regulations by government agencies may affect your ability to obtain licenses or permits or otherwise affect your ability to use the land.

The last page contained the same notice to purchasers quoted from the other two Statements, beginning "The purchaser should ascertain for himself ..." and the same paragraph, in red, as appeared on the front page. It also warned "It is unlawful for anyone to make ... any representation contrary to the foregoing or any representations which differ from this property report. If any such representations are made, please notify the Office of the Division of Land Sales ..."

On this page also appeared, in large, bold, black, underlined letters, **DO NOT SIGN UNLESS YOU HAVE READ THE OFFERING STATEMENT,** and in huge, red letters, superimposed over the receipt, PLEASE READ THE FLORIDA PUBLIC OFFERING STATEMENT BEFORE SIGNING.

All Plaintiffs who purchased land in Imperial Acres signed and returned the receipt portion of the Florida Public Offering Statement, indicating that they had read the statement which contained the above caveats.

On the face of the Property Purchase Agreement contract itself appeared the notice "The property is unimproved, unsurveyed and without roads or drainage. 35% of the property is swampy bayhead and is subject to flooding." On the back of the contract appears the following. "This purchase agreement and attached rider(s) if any, constitute the entire agreement and

Purchaser acknowledges that no additional representations have been made."

## COUNT I

■ Plaintiffs assert a claim for common law conspiracy in Count I. The limitations provision for this claim is found in § 95.11, Fla. Stat., which specifies limitations periods for all action, "other than for recovery of real property," not directly governed by specific legislative scheme. Although listing a host of legal and equitable actions, § 95.11 does not expressly identify claims for "conspiracy". Such claims are therefore governed by the period applicable to "intentional tort[s]", § 95.11(3)(*o*), and must be brought within four years. *See Falk v. Allen,* 152 Fla. 413, 12 So.2d 109 (1943), and *Newberger v. United States Marshals Service,* 751 F.2d 1162 (11th Cir. 1985).

The commencement of this limitations period is set by section 95.031; "... the time within which an action shall be begun under any statute of limitations runs from the time the cause of action accrues." "A cause of action accrues when the last element constituting the cause of action occurs." § 95.031(1), Fla. Stat.

■ A cause of action for conspiracy comprises the following elements; an agreement between two or more persons to achieve an illegal objective, one or more overt acts pursuant to that agreement, and resulting injury to the plaintiff. *See* 15A C.J.S. *Conspiracy* § 1(2) (1967); *Renpak v. Oppenheimer,* 104 So.2d 642, 646 (Fla. 2nd D.C.A. 1958) (civil conspiracy is a combination of two or more persons to accomplish an unlawful purpose by concerted action). The last of these elements will necessarily be the injury to the plaintiff.

■ Plaintiffs' were injured at the time they entered into their contractual agreements with Defendants. At the date of signing the contracts, Plaintiffs' rights and obligations were fixed, and Plaintiffs became obligated to make the payments at issue. Because Plaintiffs did have a limited right to withdraw from the contracts for a period of time after signing, and because they incurred no personal liability if they failed to make payments, however, this Court will use the date of first payment to determine when the actual injury occurred.

■ Statutes of limitations triggered by injury to the Plaintiffs begins to run when the injury commences or first appears, not when it recurs. This is so even when each recurrence marks a breach of some continuing duty owed to the plaintiff by the defendant. *E.g., Phillips v. Amoco Oil Co.,* 799 F.2d 1464, 1468–69 (11th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987); *Kelley v. School Board,* 435 So.2d 804 (Fla.1983).

These principles apply fully to actions for conspiracy, particularly where, as here, the plaintiff's injuries, though extending over a period of years, are set in motion by a contract that fixed from the inception the rights and liabilities of the respective parties. *City of El Paso v. Darbyshire Steel Co.,* 575 F.2d 521 (5th Cir.1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979) (antitrust cause of action for conspiracy accrued when parties entered original contract, notwithstanding defendant's continued receipt of contract payments well into limitations period). In such circumstances, the plaintiff's right to seek redress arises when the injury first occurs.

■ Pursuant to these principles, Plaintiffs were required to bring suit within four years from the date they entered into contracts with Defendants, or at least from the date they made their first payment under those contracts, *regardless* of whether they were aware, or should have been aware, of the facts underlying their claims, absent proof of circumstances which would warrant equitable tolling.

*Equitable Tolling*

■ Two doctrines are available, in appropriate circumstances not present here, to avoid a statute of limitations bar; equitable estoppel and equitable tolling. These doctrines are mutually exclusive because one requires proof that the plaintiff knew he had a claim, whereas the other requires proof that the plaintiff *did not* know of the facts establishing his claim.

As the Eleventh Circuit put it, the doctrine of equitable estoppel applies when a plaintiff fully "... recognizes the basis for suit, but the wrongdoer prevails upon [him] to forego enforcing his right until the statutory time has lapsed." *Cook v. Deltona Corp.*, 753 F.2d 1552 (11th Cir.1985), *reh'g denied*, 763 F.2d 398 (11th Cir.1985). By contrast, the "doctrine of equitable tolling ... is grounded in the fraudulent *concealment* of harm which gives rise to the right to sue." *Id.*, at 1563.

As the deposition testimony of all of the plaintiffs irrefutably establishes, there were *no* wrongful acts on the part of defendants which induced plaintiffs to forgo filing a lawsuit on their claims, and Plaintiffs do not rely on the doctrine of equitable estoppel. Plaintiffs do, however, rely heavily upon the doctrine of equitable tolling for several of their claims.

■ In order to benefit from the doctrine of equitable tolling, Plaintiffs must show: first, that they failed to discover, and *could not* have discovered, the facts underlying their claim before the applicable statute ran, and second, that this was so because Defendants prevented Plaintiffs from discovering the facts by "fraudulent means". *See Prather v. Neva Paperbacks, Inc.*, 446 F.2d 338 (5th Cir.1971); *Nardone v. Reynolds*, 333 So.2d 25 (Fla.1976); *Sellers v. A.H. Robins Co.*, 715 F.2d 1559 (11th Cir.1983). Plaintiffs have failed to establish either requirement.

Plaintiffs contend that the relevant statutes of limitations are tolled by Defendants' conduct *after* Plaintiffs signed their purchase agreements. Plaintiffs argue that they "trusted" Defendants, who "lulled" them into a false sense of security about their purchases. Specifically, Plaintiffs point to Defendants periodically sending newspaper articles to Plaintiffs that highlighted the fact that good things happening in Florida, including tremendous growth, and in orally reassuring some of the Plaintiffs that their land would escalate in value, if they would just hold on to it longer.

■ It is established that equitable tolling does *not* apply if "the plaintiff actu-ally discovered the tort or injury, or could have discovered the tort or injury through the exercise of due diligence ...", despite a defendant's attempts to conceal the basis for the plaintiff's claim. *Sellers, supra*, 715 F.2d at 1561. As will be discussed later in this opinion, after an evaluation of all of the evidence submitted by Plaintiffs and Defendants, including deposition testimony, this Court concludes that every Plaintiff failed to exercise *any* diligence in researching or protecting their own rights. All Plaintiffs would have had to have done was to read the Public Offering Statements with which they were provided by Defendants, (and which they were required by Defendants to sign, attesting that they had read the Statement,) in order to be on notice that there were problems existing as to the property they were buying. In most cases, reading the Statement would have put Plaintiff on actual notice that misrepresentations had been made! Plaintiffs took absolutely *no* steps to investigate the property, or the representations made by Defendants' salesmen.

Defendants did nothing to prevent the Plaintiffs from investigating their land and its value, either prior to, or after, purchase. The location of the land, and the regulations regarding it, were matters of public record. Defendants had no special knowledge that Plaintiffs could not have discovered with a minimum of inquiry. Furthermore, Public Offering Statements were provided to *every* single Plaintiff actually involved in a purchase, and signed by those Plaintiffs. For Plaintiffs to now argue that they were prevented by Defendants from discovering the true facts about the nature of their land is patently absurd.

Not one Plaintiff has made allegations sufficient to show that Defendants fraudulently concealed any information about the land, or prevented Plaintiffs from investigating on their own, and in their own behalf. *See Calder v. Uwanawich*, 449 So.2d 911 (Fla. 3d D.C.A. 1984); *Buder v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 486 F.Supp. 56 (E.D.Mo.1980), *aff'd* 644 F.2d 690 (8th Cir.1981); *Byington v. A.H. Robbins Co., supra*.

There is authority to the effect that, where the circumstances give rise to a fiduciary relationship between the parties, the defendant's denial of wrongdoing or failure to disclose may be sufficient to satisfy the second element necessary for equitable tolling. However, there was no fiduciary relationship present here. These sales were clearly arms length transactions between sellers representatives and buyers, and must be analysed as such.

After a careful evaluation of all of the facts, it is painfully apparent to this Court that the only thing that prevented Plaintiffs from discovering the facts relevant to their purchases of land was the Plaintiffs themselves. Accordingly, equitable tolling of the statute of limitations is not available to any of the Plaintiffs involved in this action. The four year statute of limitations for conspiracy began to run at the date of the first payment made to Defendants by each Plaintiff. Motions for summary judgment as to Count I are hereby granted.

## COUNT II

Count II alleges violation of the Interstate Land Sales Full Disclosure Act, or ILSFDA, 15 U.S.C. §§ 1701, *et seq.* ILSFDA imposes detailed disclosure requirements upon land developers and prohibits fraud in interstate land transactions. Plaintiffs' claims are based on § 1703(a)(2)(A)–(C), which is governed by the limitation period in 15 U.S.C. § 1711. This limitation period was amended in 1979, to be effective June 21, 1980. This Court finds the proper interpretation of the limitation period, including the fact that the amendment is *not* retroactive, has been firmly established by the Eleventh Circuit in *Cook v. Deltona Corp.,* 753 F.2d 1552 (11th Cir.1985), *reh'g denied,* 763 F.2d 398 (11th Cir.1985).

■ The statute of limitations in effect prior to amendment, and accordingly the limitation period to be applied in this case, had two parts. First, it provided that all suits must be brought within two years from discovery of the violation. It then imposed a three year absolute bar, stating, "... in no event shall any such action ...

be brought by a purchaser more than three years after the sale or lease to such purchaser." 15 U.S.C. § 1711 (1968). The Court also specifically held that "sale" referred, for limitation purposes, to the date the plaintiff contracted to purchase his land. *Cook, Id.,* at 1561.

It is clear that all contracts for sale in this action were made prior to the effective date of the 1979 amendment, and are therefore subject to the three year absolute bar. (Defendants Ex. A). *See, Orpheus Investments v. Ryegon Investments, Inc.,* 447 So.2d 257 (Fla. 3d D.C.A. 1983). Accordingly, motion for summary judgment as to Count II, as applied to all Plaintiffs, is hereby granted.

## COUNT III

Count III is based on common law fraud and therefore is governed by § 95.031(2), Fla.Stat. This limitation period is a four year accrual statute, which provides that actions for fraud (and for products liability) must be brought within four years "... running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence ... but in any event ... within 12 years after the date of commission of the alleged fraud, regardless of the date ... the fraud was or should have been discovered."

■ Plaintiff argues that the twelve year absolute bar is an unconstitutional denial of access to the courts, and cites *Kempfer v. St. Johns River Water Mgt. Dist.,* 475 So.2d 920 (Fla. 5th D.C.A. 1985), *review denied, appeal dismissed,* 488 So.2d 68 (Fla.1986), to support this proposition. However, the Court notes that the reference to the constitutionality of the limitation appears only in a footnote, and was not the basis for decision in the case. *Kempfer, Id.,* at 924.

The constitutionality of this statute of repose as it relates to products liability has been upheld in *Pullum v. Cincinnati, Inc.,* 476 So.2d 657, (Fla.1985), *reh'g denied,* 482 So.2d 1352 (Fla.1985), and *Lamb v. Volkswagenwerk Aktiengesellschaft,* 631

F.Supp. 1144 (S.D.Fla.1986). There is no persuasive reason for this Court to treat the statute as invalid as applied to actions for fraud. Furthermore, this statute of limitations was amended in 1986, with the 12 year statute of repose as to fraud specifically being retained. Accordingly, it is clear to this Court that the 12 year bar was and is valid.

A determination must be made establishing when the acts giving rise to the cause of action were discovered or *should* have been discovered *with the exercise of due diligence*. Defendants have submitted voluminous deposition testimony which clearly establishes that the alleged fraud could have and should have been discovered at the time of the initial sales contract, or in the four years following that contract.

Plaintiffs did absolutely nothing to investigate the quality and value of the land they purchased, or to follow up on the representations made to them by use of high pressure sales techniques. In fact, Plaintiffs clearly ignored written disclosures which should have put them on notice that the "puffing" utilized by the salesmen was suspect, and that the land involved might not be a desirable or sensible purchase. Clearly, Plaintiffs were on inquiry notice due to the disclosures in the Public Offering Statements, and in the contracts for sale.

Defendants have satisfied this Court with facts which make it clear that there are no genuine issues of material fact as to what should or could have been discovered, if Plaintiffs had exercised *any* diligence in researching or protecting their own interests. (Findings of Fact as to Individual Plaintiffs, below).

Plaintiffs also submitted deposition testimony and masses of other exhibits, which the Court has carefully considered. However, the Court is convinced that Count III is clearly barred by the statute of limitations, as to all Plaintiffs. This would be true even if the twelve year statute of repose were *not* applied. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Ind. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), quoting *First Nat. Bank v. Cities Service Co.*, 391 U.S. 253 at 289, 20 L.Ed.2d 569, 88 S.Ct. 1575 at 1592 (1968). The record, taken as a whole, clearly establishes that all Plaintiffs should have known, with the exercise of *any* diligence, that their land purchases were suspect, within four years of the date each contract for purchase and its accompanying Public Offering Statement was signed. Accordingly, pursuant to the findings of fact below, Summary Judgment as to Count III is granted as to claims of all Plaintiffs.

## FINDINGS OF FACT AS TO INDIVIDUAL PLAINTIFFS

1). Plaintiff *Herman H. Armbrister* (and his wife *Luetta H. Armbrister*, recently joined as a party by joint stipulation) contracted to purchase property in Flagler Estates on June 21, 1971, and payments commenced on July 22, 1971. Plaintiff Luetta Armbrister was joined because her name appears on the deed. However, her claim cannot be any better than that of her husband, and will not be addressed separately. This purchase is plainly barred by the 12 year statute of repose, as it was brought more than 12 years following the commission of the misrepresentations allegedly inducing the sale, and more than 12 years from the date of contract.

Plaintiff traded property that he had already purchased for property in Imperial Acres in July of 1977. As has already been discussed, the Imperial Acres land contract was accompanied by the Imperial Acres Public Offering Statement, which Plaintiff acknowledges he received, and on which his signature appears. It is clear that he was on notice that "the property was not suitable for building purposes ...", that it was designated as "an area of critical state concern, which would limit any development ..." and that "35% of the property is swampy bayhead and is subject to flooding." The statement also makes clear that Polk County "does not intend to provide

streets, drainage, water, utilities, or any other improvements to this land."

It is clear to this Court that Plaintiff Armbrister knew, or should have know, the nature of his purchase in Imperial Acres at the time that he affixed his signature to the public offering statement. He was certainly on notice that further investigation into the purchase was necessary in order to protect his interests. Whether or not Defendants subsequently sent Plaintiff information about progress in the State of Florida, allegedly designed to "lull" Plaintiff and to encourage further payments, or to allay any potential fears about the value of the property, Plaintiff was clearly on notice as to potential problems with, and as to the true nature of his purchase, as well as to alleged misrepresentations, at the time of the original contract. Accordingly, the statute of limitations for fraud as to his Imperial Acres purchase began running on July 29, 1977, when he knew of, or could have discovered with due diligence, the alleged fraud.

2). Plaintiff *Gordon S. Bainbridge* contracted to purchase property in Orlando Pines in October of 1970. He was contacted by a telephone solicitor, who told him about the property. He did not visit Orlando Pines before making his purchase. (Bainbridge depo. 127). Plaintiff Bainbridge read and signed the Public Offering Statement, and signed the sales contract, although he felt there were contradictions between the Statement and the other material presented to him. (Bainbridge depo. 109–112). Plaintiff made no investigation on his own to ascertain the nature or value of his property, and did not consult with an attorney, or anyone else, before signing the contract. (Bainbridge depo. 129–130, 132).

Plaintiff began calling Florida occasionally to check on his property, and made tape recordings of some of the conversations. (Bainbridge depo. 179). Plaintiff was "concerned" and "confused" by the responses he was receiving from various sales representatives each time he called. (Bainbridge depo. 180–185). Plaintiff characterized the sales representatives as "fast, slick talkers." [Bainbridge response to Defendants'

interrogatories, response I(C)]. It is obvious to the Court that by 1972, Plaintiff Bainbridge had at least some suspicions that there might be problems with his investment, yet he still did *not* make any independent inquiries, and *continued* to make monthly payments!

Plaintiff Bainbridge's purchase is clearly barred by the 12 year statute of repose for fraud. Even without the 12 year limitation, the statute of limitations for fraud began to run at the date he signed the contract, when he knew, or should have known with the exercise of due diligence, that misrepresentations had been made to him.

3). Plaintiff *Harold J. Bieber* purchased three lots in Orlando Pines, signing the purchase contracts in 1975. Plaintiffs wife, *Delores M. Bieber,* is named on the deeds, and has been joined as a party by joint stipulation. However, she did not sign the contracts, and no representations were made to her. Her claim will be considered along with that of her husband.

Plaintiff Bieber does not dispute receiving the Public Offering Statement, or returning the receipt indicating that he had read it. Plaintiff visited another land sales site in Florida at the time he made his Orlando Pines purchase, and almost decided not to keep the Orlando Pines land because of its swampy nature. In fact, Plaintiff stated that a Housing and Urban Development (HUD) report which he read about the land "kept him awake at night." (Bieber depo. 98). Plaintiff actually went to the Orlando Pines sales office, and told the salesman he wanted out of the contract, and that he wanted to visit the property, due to his fears that it was swampy. The salesman refused to take him, because there were too many snakes! (Bieber depo. 125).

Clearly, Plaintiff was on notice as to potential problems with the land in 1975, at the time he read the Public Offering Statement, doubted the value of the property, and signed the contracts. Plaintiff Bieber chose to continue with the deal, in spite of his fears, and did not make any independent inquiry into the value of the land he

was purchasing, either at that time, or in the nine years following his signing of the contract. (Bieber depo. 147, 157–159). It is obvious to the Court that suit, filed nine years after the contract was entered, is barred by the four year limitation period for fraud, as that limitation period began to run on the date Plaintiff Bieber signed the contracts, if not before.

4). Plaintiff *Leslie E. Fuchs* contracted to purchase property in Orlando Pines in May of 1973. Plaintiffs' wife, *Bettie J. Fuchs*, was named on the deed at issue, and has been joined as a party by joint stipulation. She did not sign the contract, and representations were not made to her. Her claim will be considered along with that of her husband.

Plaintiff Fuchs does not deny that he received, read, understood, and signed the Public Offering Statement. (Fuchs depo. 75). This statement alone should have been enough to put Plaintiff on notice, and to cause him to make an investigation, *before* he entered the contract. Plaintiff did visit the property several months after signing the contract, but he did not make any other independent investigation into the nature or value of the land. (Fuchs depo. 79–81).

Even if Plaintiff were not found to be on notice at the time of signing the contract, he was told at the time of his purchase that the company had plans for reselling the whole area "for a significant profit", hopefully within two years. (Fuchs depo. 95–96). This obviously did *not* occur. In September of 1978, Plaintiff Fuchs wrote a letter inquiring about the status of resale plans, and was informed that Defendants had no plans to resell the property on his behalf. (Fuchs depo. 101–02, 180). In his own words, Plaintiff felt "very uncomfortable being told one thing and later being told something else." (Fuchs depo. 239). Although the Court finds the statute of limitations as to Count III began running at the date of contract, it would have begun running in September of 1978, when Fuchs was informed that the earlier representations as to sale of his property were false, if it had not already begun to run in 1973.

5). Plaintiff *Robert Gagnier* purchased several properties from Defendants: Flagler Estates on August 13, 1971, Imperial Acres on February 24, 1973, and Imperial Acres on July 16, 1977. Plaintiff's wife, *Maria E. Gagnier*, has been joined as a party by stipulation. She signed only one contract, the Flagler Estates purchase agreement, and her name appears on the deeds in question. Separate representations were not made to her. Plaintiff Maria Gagnier's claim will be considered at the same time as those of her husband.

According to Plaintiff Gagnier, all of his Florida land purchases were to be turned over for profit in a "relatively short period of time ...". (Gagnier depo. 35) His purchases were made subsequent to telephone solicitation. Plaintiff never visited any of the properties.

When Plaintiff Gagnier purchased his property in Flagler Estates, he was allegedly told that Defendants would resell the properties as a whole within three to five years, at which time the land would have tripled in value. (Gagnier depo. 39, 43–44). Plaintiff received a letter from Defendants in 1978, informing him that a home-building program had started at Flagler Estates. (Gagnier depo. 89).

Plaintiff Gagnier received and signed the receipt attached to the Public Offering Statement for Flagler Estates, but claims he does not believe he read it. (Gagnier depo. 52). Even without the Public Offering Statement, Gagnier was clearly on notice that the representations made to him were false when five years passed and the property had not been sold, and even more clearly in 1978, when he received the notice that a home-building program had begun, after specifically being told that the land would be resold as a package!

As with the Flagler Estates purchase, Plaintiff Gagnier was told at the time he made his first purchase in Imperial Acres that Defendants would resell the property as a whole, in three to seven years. (Gagnier depo. 113, 104). Although the Imperial Acres literature that he received in 1973

did not tell him that Defendants would not resell the land, the paperwork he received about Imperial Acres in 1977 specifically disclosed that the defendants *do not resell property* for their purchasers!

There is no question that Plaintiff Gagnier received and signed the documents which disclosed, as previously discussed, that the property was not suitable for building, etc. Plaintiff admits that, had he read the written disclosures, he would have known that the alleged oral representations that the land could be developed were false! (Gagnier depo. 112).

Plaintiff Gagnier also received, and signed, the Public Offering Statement which accompanied his 1977 purchase in Imperial Acres. He simply did not bother to read it. (Gagnier depo. 167–68). Plaintiff admits the disclosures were "clear and unambiguous". (Gagnier depo. 168). Found within the 1977 statement is the language notifying purchasers that Defendants' sales practices had been investigated by the FTC. Plaintiff had only to read the statement to be informed that Defendants had agreed to "cease and desist" from representing that they would resell lots for buyers. (see Facts Regarding Imperial Acres above).

It is clear to this Court that Plaintiff Gagnier was on notice as to the alleged fraud at the time he signed each sales contract, with regard to each sale. However, Count III as to the 1971 purchase is also barred due to the twelve year statute of repose for fraud. The statute of limitations as to the 1973 and 1977 purchases began to run at the time each contract was signed. It is painfully obvious that *minimum* diligence on the part of Plaintiff would have alerted to him to the allegedly fraudulent representations made to him by the salesmen. Even without the earlier Public Offering Statements, Plaintiff should have known when he received the 1977 information, that there were real problems with his earlier investments, and his reliance on the Defendants' representations. Accordingly, Count III is barred by the four year limitations period.

6). Plaintiff *Milo Johnson* bought property in Flagler Estates in June of 1971, and in Imperial Acres in July of 1977. Plaintiff's wife, *Gladys I. Johnson,* has been named as a Plaintiff by joint stipulation, due to the presence of her name on the deeds at issue. Her claims will be considered along with those of her husband.

Plaintiff Johnson was sold the Flagler Estate property by telephone, and traded another land purchase for the Imperial Acres property. He did not, and has not, ever visited Florida to see his property.

Plaintiff Johnson was going through bankruptcy at the time that he received the Flagler Estates solicitation, and was looking for a quick way to make money in a short period of time, perhaps within six to eight months. (Johnson depo. 30, 122). He also expected that the land would be developed "in the near future". (Johnson depo. 36). He expected for homes to be built on the property, although the Public Offering Statement expressly states, "This is not a homesite offering." (Plaintiffs' Ex. A.). There is no question that Plaintiff received, and signed the relevant Public Offering Statement, which he "scanned". (Johnson depo. 38, 51).

Plaintiff Johnson made no independent investigation of the property involved, and did not even look at the map provided to see where the land was located! (Johnson depo. 51–53). Plaintiff contends he relied on alleged representations of the telephone salesman that Flagler Estates was southwest of Orlando, and near Disney World, when in fact it is northeast, and distant from Disney World, which can be easily ascertained by looking at the map that he received with his brochure. (Plaintiff's Ex. A).

Although this purchase was made in 1971, Plaintiff did not "get inquisitive" about it until 1984, approximately 13 years later. (Johnson depo. 54). This Flagler Estates purchase is clearly barred by the 12 years statute of repose, and the four year statute of limitations, which began to run on the date Plaintiff signed his contract; the date when he should have known, with the exercise of *any* diligence

in protecting his own interests, that misrepresentations had been made as to the nature and value of the property.

Plaintiff Johnson purchased property in Imperial Acres in 1977, using land he had purchased in an earlier land deal as a partial trade. He was not exactly sure of the location of this purchase at the time that he made it, and was still unaware of the location of Imperial Acres at the time his deposition was taken in March of 1987. (Johnson depo. 116). Plaintiff expected that he would make money on this purchase in a year or two. (Johnson depo. 118). He did not seek any professional advice as to the investment, and did not visit the property, or make even a minimal investigation into its nature and value.

There is no question that Plaintiff Johnson received, "scanned", and signed the Public Offering Statement, and the contract. Accordingly, he should have been cognizant of the explicit disclosures about Imperial Acres, previously outlined in this opinion. The statute of limitations as to this purchase began to run on the date Plaintiff Johnson signed the contract, July 8, 1977. Accordingly, Count III is barred.

7). Plaintiff *Raymond J. Lambert* made his Orlando Pines purchase in November of 1970. Plaintiff Lambert was voluntarily dismissed from this action on June 19, 1987.

8). Plaintiff *Robert H. Lambertsen* bought property in Flagler Estates in December of 1971 and May of 1972. Plaintiff was first contacted by a telephone salesman, who allegedly represented to him that the land was a great investment opportunity, being close to Disney World. He was also allegedly told that his investment would double in five years. (Lambertsen depo. 46–48). Plaintiff received, read, and signed the Flagler Estates Public Offering Statement. (Lambertsen depo. 69). He did not make any independent inquiries or investigation before making his first Flagler Estates purchase.

At some point between signing the first contract in 1971, and making his second purchase in 1972, Plaintiff became concerned about whether or not he had made a good investment. He made inquiry to the Division of Florida Land Sales, and to HUD, after a discussion with his father about Florida property, and "buying swamp land." (Lambertsen depo. 87–90). The Division of Florida Land Sales sent him a copy of the Public Offering Statement which he had already received. HUD sent a consumer protection pamphlet, and a letter explaining: "This office cannot offer any opinion regarding the reliability of any developer or the value, location or suitability of any particular development." (see Appendix to Memorandum in Support of Defendants' Motion for Summary Judgment against Plaintiff Lambertsen, Tab 6; Exhibit F).

Plaintiff Lambertsen was not satisfied with either response. "I just felt it was a pat answer from another large government organization and really didn't dispel any doubts about the wisdom of my investment ...". (Lambertsen depo. 170). His doubts notwithstanding, Plaintiff purchased a second lot in Flagler Estates in May of 1972!

In either 1974 or 1975, Plaintiff visited the property for the first time and was *not* satisfied with his inspection. (Lambertsen depo. 79). He had expected more development, and that the property would be much closer to Disney World, based on prior sales representations. (Lambertsen depo. 80, 118–119, 247–248). In June of 1976, Plaintiff Lambertsen wrote to Defendants and asked for an evaluation of the Flagler Estates development, but never got an adequate response to his questions. (Lambertsen depo. 177).

As to Plaintiff's second purchase, he was allegedly told the turnaround period would be even quicker than with his first purchase. (Lambertsen depo. 95). When he visited the property in 1977, he found that "waterfront property" meant that his lot was on what "looked like a drainage ditch of some sort ..." (Lambertsen depo. 117–18, 173).

In Plaintiff Lambertsen's case, Plaintiff had actual notice by 1977 that his properties were not at all what he had been led to expect, and that in fact, misrepresentations had been made as to the nature of the

property, its value, and the fact that it had not been resold by Defendants as had been promised.

The 12 year statute of repose for fraud bars Plaintiff's Count III claims as to both purchases. Even without the 12 year bar, the four year statute of limitations would have begun at the time he received the Public Offering Statements and proceeded to sign the contracts, or in 1977, when he had additional actual notice of the misrepresentations. As with the other Plaintiffs, any exercise of due diligence would have allowed Plaintiff to discover that his property was not what he was being led to believe, and that misrepresentations had been made.

9). Plaintiff *Frances C. Lentine* bought property in Flagler Estates in December of 1971, and again in August of 1974. Lentine's mother, *Anita A. Lentine*, was named on the deeds to the property at issue, and has recently been joined as a party by joint stipulation. She did not participate in any way in the purchase of the two properties. (Lentine depo. 196, 201). Her claim can be no better than than that of her son, and will not be discussed separately.

Plaintiff alleges that the representations made to him as to both purchases were essentially the same. (Lentine depo. 82–83). He was told that this was going to be a "short term" investment, and that Defendants would undertake to sell the property to developers "within a short period of time." (Lentine depo. 79, 208). Plaintiff also felt the land would be used for homesites, based on telephone sales representations. (Lentine depo. 207). Plaintiff Lentine received and signed the Public Offering Statement before each purchase, which clearly states that the property was *not* a homesite offering. Plaintiff could not recall whether or not he actually read the Statements, although he does not contest that his signature appears on both.

Plaintiff did visit Flagler Estates in January of 1972, although he did not see his own lot. (Lentine depo. 64). He noted at the time of his visit that "there were areas along the road leading to the property that were underwater." (Lentine depo. 66). Plaintiff Lentine came to Orlando in December, 1976, but chose not to visit the property. (Lentine depo. 233–24.)

Even if Plaintiff were not on notice as to alleged fraudulent representations at the time he signed each contract, due to inconsistencies between the alleged representations and the Public Offering Statement, he was clearly on notice by 1978. At that time, Plaintiff Lentine wrote to Defendants and asked them to sell his property as soon as possible, unless they could give him some assurance "that resale at a good profit is likely within the next 10–15 months." (Lentine depo. 360). It is obvious that in 1978, seven years after his first purchase, Plaintiff had absolute knowledge that the representations made to him about resale of his property were false. Furthermore, he never received an answer to the letter he sent, nor to two subsequent letters. (Lentine depo. 75, 79, 361, 160–61).

Due to the facts outlined above, Count III as to the 1971 purchase is barred due to the 12 years statute of repose, and by the four year statute of limitation as to Plaintiff's 1974 purchase.

10). Plaintiffs *Frederick V. Locey* and his wife *Edna C. Locey* made one purchase in Orlando Pines in June of 1975. Both Plaintiffs signed the contract and Public Offering Statement, which contain the explicit disclosures already discussed in this opinion. Plaintiffs were contacted by a telephone salesman, and decided to visit the property. Plaintiffs were specifically told that the property would be resold by Defendants within two years, for a sizeable profit. (F. Locey depo. 144, E. Locey depo. 38). Plaintiffs twice attempted to visit their property in Florida, once before their purchase, and once after. Both times they were told that it could not be shown to them! (F. Locey depo. 145, E. Locey depo. 62).

In a letter written by the Loceys in response to a Range 26 Landowner's Association letter, the Loceys stated, "... we have always felt something was wrong when Florida Leisure could not or would not show us the exact location of the property

..." (F. Locey depo. 244). When questioned about this statement, Plaintiff Frederick Locey confirmed that he and his wife had the feeling that something was wrong from 1975 on, yet they still bought the property and continued to pay for it! Plaintiffs also made no independent investigation into the value of their property. (E. Locey depo. 45).

It is clear from the above facts, that Count III as to Plaintiffs' 1975 purchase in Orlando Pines is barred by the four year statute of limitations, which began to run at the date they signed the contract and Public Offering Statement.

11). Plaintiffs *Clarence W. Lutz* and *Ruth S. Lutz* purchased property in Flagler Estates in June of 1971, and in Imperial Acres in July of 1977. Plaintiff Clarence Lutz saw an ad for Roland International in the T.V. Guide Magazine, sent in the coupon, and was contacted by a telephone salesman. [Responses of Lutz to Defendants' first interrogatories dated May 9, 1986; response to Interrogatory I(C).] In this way, he found out about Flagler Estates.

Plaintiff Lutz was told that if he invested in Flagler Estates, he would would double or triple his money in approximately three years. (C. Lutz depo. 42). Plaintiff did not independently investigate the value of the property. (C. Lutz depo. 76). Plaintiff believed, due to the sales representations, that Flagler Estates was to be for homesites. (C. Lutz depo. 50–51). Plaintiff C. Lutz alleges that he was called by representatives of Defendants at least once a month, who told him that the property was "coming along great ... like streets graded, drainage ditches, and a building started." (C. Lutz depo. 64, 65).

Also, in 1975, or 1976, Plaintiffs attempted to visit their property, and were given a very "chilly treatment." (C. Lutz depo. 105–110). They were not shown the property by a Roland representative. Plaintiffs did find a realtor to show them Flagler Estates. They saw at that time that the roads were not "all-weather roads", as was allegedly represented to them, (C. Lutz depo. 226), and that the property had not made any progress. (C. Lutz depo. 64, 66). The Court notes that Plaintiff had signed the Public Offering Statement, which specifies that Flagler Estates was *not* a homesite offering.

Plaintiff Ruth Lutz did not actually participate in any of the conversations with salesmen prior to, or after, the purchases, (R. Lutz depo. 21–23), although she did sometimes listen in on another telephone. (C. Lutz. depo. 72). She signed both contracts, and one Public Offering Statement. She also was with her husband when the properties were viewed.

The Imperial Acres purchase was also made sight unseen. However, Plaintiffs visited Imperial Acres in 1977, and were flown over the property. Plaintiff signed the Public Offering Statement, with its explicit disclosures, including the information that the developer had been investigated by the FTC, and had signed a consent order, which prohibited Defendants from representing that they would buy back or resell lots.

Plaintiff alleges that he was told that he was buying part of an entire parcel, rather than an individual lot. (C. Lutz depo. 171–72). However, the second page of his contract clearly indicates that he was buying a specific parcel in Imperial Acres, Parcel 423. (C. Lutz depo. 172–73). Plaintiff alleges that he was led to believe that the land *would be* sold by Roland as a package. (C. Lutz depo. 179).

Plaintiffs did not consult with anyone about their Imperial Acres purchase, except with salesmen of Defendants. (C. Lutz depo. 195). This Court is convinced, as would be any reasonable person using any standard, that Plaintiffs knew, or should have known with the exercise of due diligence, that misrepresentations had been made to them at the time they signed the contracts for each purchase. Accordingly, the four year statute of limitations bars Count III. Furthermore, the 1971 purchase is barred by the 12 year statute of repose.

12). Plaintiff *Darell MacFarland* bought three lots in Orlando Pines in 1971, and one in Flagler Estates in 1971. His

wife *Laura K. MacFarland* and children *Grace MacFarland,* and *Darell MacFarland,* have been joined as parties by joint stipulation, due to the appearance of their names on the deeds at issue. However, they were not part of the initial contracts, and no representations were made to them. Their claims can be no better than those of Plaintiff Darell MacFarland, and will be discussed in relation to his claims.

Plaintiff was first contacted by telephone solicitation. He never bothered to visit the land he purchased in Florida, although he has been to Florida numerous times. (MacFarland depo. 33, 64). Plaintiff MacFarland allegedly was told that his land in Orlando Pines would double or triple in value in five to seven years. [MacFarland answer to Defendants' first interrogatories; response I(C)]. Plaintiff also alleges that he was told that Roland would handle the resale, presumably within five to seven years. (MacFarland depo. 96). Clearly, this resale did not take place, which should have put Plaintiff on constructive notice that misrepresentations had been made. More importantly, Plaintiff received, and signed, the Orlando Pines Public Offering Statement, which clearly put him on notice at the time of his initial purchase.

Plaintiff MacFarland next bought land in Flagler Estates, in August of 1971. Allegedly, he was told that the land could be built upon, and was being divided up for residential purposes. (MacFarland depo. 131). As has been previously discussed, the Flagler Estates Public Offering Statement expressly refutes any representations that the property is homesite property.

Plaintiff made no independent investigation into the value of the properties he purchased. (MacFarland depo. 182, 183). He did become dissatisfied when the properties had not sold as the years passed, and expressed "impatience that there had been no resale ..." (MacFarland depo. 177). In approximately 1979, Plaintiff attempted to sell the property himself, but most of the realtors he contacted never got back to him. (MacFarland depo. 165, 168, 183). This "planted a seed of doubt" in MacFarland's mind. (MacFarland depo. 183).

Although the "seed" of doubt does not seem to have taken root until 1984, the fact is that Plaintiff MacFarland was on notice as to the true nature of his property when he received and signed the Public Offering Statements in 1971. The MacFarlands' Count III claim is barred both by the four year statute of limitations, and the 12 year statute of repose.

13). Plaintiff *Gerald J. Malanka* purchased property in Orlando Pines in May of 1974, Imperial Acres in November of 1977, and Flagler Estates in April of 1979. Because his children *Gerald E. Malanka* and *Judith Ann Malanka* are named on the deeds in issue, they have been joined as parties to this action by joint stipulation. However, they were not involved in the purchase of these properties, and no representations were made to them. Their claims will be considered along with those of their father.

In May of 1974, Plaintiff Malanka purchased land in Orlando Pines, after being contacted by a telephone solicitor. He was told that he was making a good investment that would be worth money in the future, and that a developer or someone else might be interested in the property. Plaintiff took this all to mean he could expect the predictions to be true in five to six years. (Malanka depo. 63, 64). He did not consult anyone or investigate the land before making his purchase. (Malanka depo. 74–76). Plaintiff also did not visit the property.

Plaintiff Malanka alleges he was told that "they planned development ... they intend to put a road ...". (Malanka depo. 79). However, he also admits that he received and signed the Public Offering Statement, which expressly states, among other disclosures, "There is no provision for roads." Plaintiff never visited Orlando Pines, nor did he make any independent investigation. (Malanka depo. 112).

Plaintiff Malanka purchased land in Imperial Acres in November of 1977, after receiving another telephone solicitation. This land was also purchased sight unseen. (Malanka depo. 114). Plaintiff received and signed the Public Offering Statement. However, he claims that he did not realize

that parts of the property were underwater, or that the land was unsuitable for building purposes. (Malanka depo. 131, 132, 139). The Statement he signed included the caveat that the Developer had been investigated by the FTC! Plaintiff was unaware that this land, and his Orlando Pines purchase, were in the Green Swamp, although this fact was specifically disclosed, and appeared on the map that he was sent. (Malanka depo. 142–43).

Plaintiff alleges that he was told that industrial development would take place on Imperial Acres, which is entirely inconsistent with the clear disclosures with which he was provided, and which he signed and returned. (Malanka depo. 160).

Plaintiff Malanka purchased land in Flagler Estates in 1979. Again, he was approached by a telephone solicitor. The Public Offering Statement with which he was provided is slightly different than that provided with earlier sales, as it has *additional* disclosures, as well as the disclosures discussed earlier in this opinion. Under the section titled Land Use, the Statement discloses, "The properties described herein are not offered for homesite purposes, therefore, the developer has not made any determination as to whether fill or additional protection against flooding might be required. Such determinations are the responsibility of the purchaser." It also states, "Portions of Flagler Estates have been designated as flood prone ..." "Flagler Estates is not being offered as a homesite subdivision. There are no homes on the property", and "The future of any land is very uncertain; do *NOT* count on appreciation. *The developer does not engage in reselling the purchaser's property, and makes no representation regarding the purchaser's ability to resell his property at any time in the future.*" (emphasis added). "Changing land development and land use regulations by government agencies may affect your ability to obtain licenses or permits or otherwise affect your ability to use the land."

The Statement also includes the language, "Only the facts stated above reflect the characteristics of this property. Com-

ments and inferences by the salesmen contrary to these specifics are unauthorized and should be reported directly to the State Regulatory Agency ..."

Plaintiff bought the property sight unseen, but visited the property within the six month visitation period. He was flown over the property, and observed it only from the air. (Malanka depo. 236). Plaintiff believed that Flagler Estates would be a residential development, due to sales representations. (Malanka depo. 266). Plaintiff Malanka conducted no independent investigation into the nature or value of his purchase. He signed and returned the Public Offering Statement receipt. (Malanka depo. 239).

As with the other Plaintiffs, it is clear to this Court that the statute of limitations as to fraud began to run at the date Plaintiff Malanka signed each contract and/or Public Offering Statement. Accordingly, the Malankas' Count III is barred by the four year statute of limitations.

14). Plaintiff *Robert C. Mertens* bought a lot in Orlando Pines in November of 1970, and in Flagler Estates in September of 1971. His wife *Marian J. Mertens* was joined as a party by joint stipulation, as her name appears on the deeds of the property at issue. However, no representations were made to her, and she did not sign the contracts or Public Offering Statements. Accordingly, her claims can be no better than those of her husband, and will be addressed concurrently with her husband's claims.

Plaintiff bought his property in Orlando Pines, sight unseen, after receiving a telephone solicitation. Plaintiff alleges that he was told that his land was 135 feet above sea level, and that it would appreciate quickly in value. (Mertens depo. 95). He was specifically told that the property would be resold in twelve to fifteen months. When it did not sell in that period, he was told it would be sold in six to ten months. (Mertens depo. 137–38).

Plaintiff Mertens received and signed the Public Offering Statement for Orlando Pines, which clearly discloses that portions of the land are swampy, and that the land

is *not* suitable for building purposes. Plaintiff simply "didn't pay much attention to it." (Mertens depo. 112). Plaintiff Mertens did not consult with anyone except his wife, before making the purchase. (Mertens depo. 115).

Plaintiff Mertens purchased property in Flagler Estates in September of 1971. He was again approached by telephone. Plaintiff received, read, and signed the Public Offering Statement before signing the sales contract. (Mertens depo. 199–201). Plaintiff expected to double his money within ten to fifteen months. (Mertens depo. 204). Obviously, this did *not* occur. Plaintiff did not visit either property before or after purchase. (Mertens depo. 246, 247).

Some time within the 1970 to 1972 time frame, Plaintiff received a consumer protection brochure from the Office of Interstate Land Sales, U.S. Dept. of Housing and Urban Development. Plaintiff may have written for the information, although he is not certain. (Mertens depo. 252–54). The brochure was found in Plaintiff's Orlando Pines folder, and is full of warnings about property bought through telephone promotions! (Mertens depo. 254–55).

Plaintiff Mertens' claims as to Count III are barred both by the four year statute of limitations, which began to run on the dates the contracts for purchase were signed, and by the 12 year statute of repose.

15). Plaintiff *William H. Ware, Sr.* purchased property in Flagler Estates in December of 1971, and in Imperial Acres in December of 1977. Plaintiff Ware was approached by mail, and then by telephone solicitation. As to the Flagler Estates purchase, it was allegedly represented to Plaintiff that Disney World was located very near, and that he would make a "killing when Disney World would come into that locality." (Ware depo. 55). Plaintiff Ware does not dispute that he received and signed the Public Offering Statement. He also admits that he received a map from Defendants, which showed the relative location of Disney World and Flagler Estates. (Ware depo. 57, Plaintiff's Ex. A).

As Plaintiff explained, "Well, I mean since I'm looking at it, I can see it seems like it's a pretty good distance." (Ware depo. 59). Disney World is *obviously* quite a distance from Flagler Estates.

Plaintiff himself never visited Flagler Estates, although his son visited for him, and was flown over the property.

After Plaintiff Ware had finished paying for his Flagler Estates property, he was approached by telephone to make a purchase in Imperial Acres. (Ware depo. 70). Ware alleges that he was told that Imperial Acres was beach front property. (Ware depo. 73). Ware made no investigation as to the truth of the alleged sales representations, and did not look at a map to ascertain the location of the property, although he was sent a map by Defendants. (Ware depo. 73, 77, 78). Plaintiff was under the impression that the land would be used for beach front hotels! (Ware depo. 74). The Court notes that a cursory examination of any map of the area would indicate that Imperial Acres is not near any beach, Plaintiff's protestations of an inability to read maps notwithstanding. (Ware depo. 78–79).

Plaintiff does not dispute the fact that he received and signed the Public Offering Statement Receipt, indicating that he had read the Imperial Acres Statement, which has already been discussed. Plaintiff Ware was invited to inspect the Imperial Acres property, but chose not to do so. (Ware depo. 85).

The statute of limitations for Count III, as to Plaintiff Ware, began to run on the dates that his contracts for purchase were signed. There is not doubt that he received, and signed, the Public Offering Statements which accompanied both purchases. Furthermore, a *minimum* of effort or investigation would have put Plaintiff on actual notice that the alleged representations made to him about the location of his properties were false. Accordingly, summary judgment as to Count III is granted.

### COUNT IV

In Count IV, Plaintiffs assert claims for civil theft under Florida's Anti-Fencing

Act, § 812.014(1), Fla.Stat. (1985). Plaintiffs assert that from 1970 to 1984, Defendants knowingly obtained and kept the monthly payments Plaintiffs paid for their "investment contracts," and did so with the intent of permanently depriving Plaintiffs of that money. Count IV also alleges that Defendants used fraud, false pretenses, deception, and willful misrepresentations in order to obtain and keep the money. For purposes of their motions for summary judgment only, Defendants concede that Count IV states a claim for civil theft.

Claims for civil theft must be brought "within five years after the cause of action accrues." § 812.035(10), Fla.Stat. (1985). Because the term "accrual" is not defined in Chap. 812, its meaning must be taken from Chap. 95, which governs "except as provided ... elsewhere in these statutes." § 95.031, Fla.Stat. (1985). Accordingly, a cause of action for civil theft accrues "... when the last element constituting the cause of action occurs." § 95.031(1), Fla. Stat.

■ As in the case of civil conspiracy, Plaintiffs had a claim for civil theft once they were damaged by Defendants' alleged actions. This claim arose, and the limitations period commenced, when the injury *first* occurred; namely, when Plaintiffs made their first payments to Defendants, or contracted to do so. Absent equitable tolling, which is not available to Plaintiffs for reasons already set forth, the statute of limitations precludes a suit brought five years after the date the contract was signed.

■ Plaintiffs contend that claims for civil theft are governed by a "discovery" standard, relying on *Senfeld v. Bank of Nova Scotia Trust Co.*, 450 So.2d 1157 (Fla. 3d D.C.A. 1984). The holding in *Senfeld* seems to disregard the clear statutory scheme and language, particularly as there is no express discovery language in § 95.-031(1). However, the *Senfeld* Court recognized the "... fundamental principle that ... the accrual ... must coincide with the aggrieved party's discovery or duty to discover the act constituting an invasion of his legal rights." *Id.*, at 1163. Even if this

Court accepted the *Senfeld* argument applying a discovery standard to the accrual language, which it does not, this Court has already found that *all* Plaintiffs were on notice, or reasonably *should* have been on notice (using a reasonable man standard), at the time they signed their contracts!

■ The Second District Court of Appeals reached a different result than the *Senfeld* court, in *Bove v. PBW Stock Exchange, Inc.*, 382 So.2d 450 (Fla. 2d D.C.A. 1980). The *Bove* court found that a claim for conversion, which is governed by the same "accrual" standard as that applicable to claims for civil theft, began to run at the time of conversion, as distinguished from the time of discovery by the plaintiff. *Id.*, at 452. The Court finds this interpretation most faithful to the clear statutory language. Accordingly, all claims for civil theft are barred, because all contracts for sale were entered into more than five years prior to the date of filing of this action, August 16, 1984, and all first payments were made more than five years before the date of filing. (see Appendix One). Motions for summary judgment as to Count IV are hereby *granted*.

### COUNT V

In Count V, Plaintiffs assert that Defendants violated the Florida Uniform Land Sales Practices Law (FULSPL). Chap. 498, Fla.Stat. The FULSPL contains an absolute statutory bar which begins running on the date the purchaser made his first payment to the subscriber. "Since discovery has now established that no plaintiff in this action made any initial payment to the defendants on or after August 16, 1979, plaintiffs do not oppose defendants' motion on this claim." (Plaintiffs' Memo. in Opposition to Defendants Motions for Summary Judgment at 14). Accordingly, summary judgment as to Count V as to all Defendants is hereby *granted*.

### COUNT VI

In Count VI, Plaintiffs attempt to assert claims pursuant to Section 12 of the Securities Act of 1933, 15 U.S.C. §§ 77*l*(1) and

(2). The 1933 Securities Act provides its own statute of limitations, which has not been amended since 1934. After providing a one year limitations period, running from date of discovery, § 13 then provides an *absolute* three year bar; "in no event shall any action be brought ... more than three years after the security was ... offered to the public, or ... more than three years after the sale." 15 U.S.C. § 77m. Assuming for purposes of these motions only, that the land the Plaintiffs bought does indeed constitute a "security", the statute begins to run, at the latest, from the date of the sale of the security.

Where, as here, the "security" is sold by contract, the Act equates "sale" with "contract for sale". *Id.* § 77b(3). *See, Cook v. Deltona, supra,* 753 F.2d at 1561 (construing "sale" in limitations provision of ILSFDA).

■ Plaintiffs contend that no "sale" occurred here, within the meaning of the limitations provision, until Plaintiffs' last payment was made on their installment sales contracts. This contention is not supported in law. The Act's definition of "sale" indicates that, where a security is sold by contract, the contract of sale *is* the sale. § 77b(3). *See Amoroso v. Southwestern Drilling Multi-Rig Partnership No. 1,* 646 F.Supp. 141, 143 (N.D.Cal.1986).

Plaintiffs contend that the date of sale is a "knotty factual issue" which cannot be resolved on summary judgment. This Court does not agree. The issue of whether a sale occurs at the date of contract or at the date of last payment is an issue of statutory construction. Under the Act, the date of contract for sale is the sale.

■ Plaintiffs also contend that equitable tolling should apply. However, the three year bar is absolute, and is not subject to equitable tolling. *See Summer v. Land & Leisure, Inc.,* 664 F.2d 965, 968 (5th Cir. Unit B 1981) and *Cook, supra.* (Even if the Act were subject to equitable tolling, this Court has already found that the facts alleged in this action cannot support the use of the doctrine of equitable tolling). Those Plaintiffs who contracted over three years before suit was filed are absolutely barred from bringing a claim under this Act. Accordingly, motions for summary judgment as to Count VI are hereby *granted.* (*see* Appendix A).

## COUNT VII

■ In Count VII, Plaintiffs attempt to assert a securities fraud claim under Section 10 of the 1934 Securities Exchange Act (1934 Act) and SEC Rule 10b–5. The Court will assume, for purposes of these motions, that such a claim has been asserted. The 1934 Act furnishes no statutory limitations period for actions alleging violations of Section 10(b) and 10b–5. Accordingly, the Eleventh Circuit has held that federal courts must apply the limitations period of the forum state most analogous to the Federal Securities Exchange Act. *See Friedlander v. Troutman, Sanders, Lackerman & Ashmore,* 788 F.2d 1500 (11th Cir.1986). When Florida is the forum state, the proper limitations period applicable to apply to these claims is the limitations period applicable to the anti-fraud provisions of the Florida Securities Act, Chap. 517, Fla.Stat. (1985). *Byrne v. Gulfstream First Bank & Trust Co.,* 720 F.2d 686 (11th Cir.1983), *aff'd without opinion* 528 F.Supp. 692 (S.D.Fla.1981).

For violations of Chap. 517, Florida law provides a two year limitations period "running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence, but not more than 5 years from the date such violation occurred." § 95.11(4)(e), Fla.Stat. (1985). The right of action provided arises when a sale is made in violation of the Chapter's provisions. § 517.211, Fla.Stat. (1985). The "violation", then, that triggers the limitations period occurs when the purchaser contracts to buy the security. § 517.021(17), Fla.Stat. (1985).

■ The land sales contracts in this case fixed from the inception the rights and liabilities of the parties. Plaintiffs made payments under the terms of those contracts, *not* as monthly "investments", but because they were contractually obligated

to do so, or risk forfeiting all payments previously made, under the terms of their purchase agreements. Thus, these installment payments were no more separate and distinct "sales" (as Plaintiffs argue) than are continuing payments under a mortgage. Indeed, under Florida statutory law, installment land sales contracts such as these are treated as mortgages. § 697.01 Fla.Stat. (1985). *See Jasper v. Orange Lake Homes, Inc.*, 151 So.2d 331, 333 (Fla. 2d D.C.A. 1963), *cert. denied*, 155 So.2d 694 (Fla.1963).

In *Byrne, supra,* the Court held that the limitations provision involved here, enacted as an amendment in November, 1978, applies retroactively. Accordingly, all Plaintiff were required to assert any claims under Section 10(b) and Rule 10b–5 within five years of the date they contracted to buy their land. None of the Plaintiffs did so. Accordingly, motions for summary judgment as to Count VII are hereby *granted.*

### COUNT VIII

In Count VIII, Plaintiffs attempt to assert a claim under the Florida Securities Act. As was discussed in the previous section dealing with the Securities Exchange Act of 1934, which "borrows" the statute of limitations of the Florida Securities Act, such a claim must be brought within five years from the date of the contract. Since all Plaintiffs purchased their land from Defendants more than five years before they finally brought suit, their claims are barred. Accordingly, motions for summary judgment as to Count VIII are hereby *granted.*

### COUNT IX

In Count IX, Plaintiffs assert claim under the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968. RICO creates a civil remedy for persons injured by an enterprise engaged in a pattern of racketeering activities which affect interstate commerce. While creating a federal cause of action, RICO itself specifies no limitations period for bringing such actions.

On June 22, 1987, the United States Supreme Court determined that the four year statute of limitations used for Clayton Act claims, 15 U.S.C. § 15b, applies to all civil suits brought under the Federal RICO Act. *Agency Holding Corp. v. Malley-Duff & Associates, Inc.,* —— U.S. ——, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Section 15b of the Clayton Act provides, "Any action to enforce any cause of action under section 15, 15a, or 15c of this title shall be forever barred unless commenced within four years after the cause of action accrued."

Two issues not addressed by the *Agency* decision must be determined here: 1) the date when a claim accrues under the Clayton Act standard, and 2) whether the Court's decision in *Agency* should be applied retroactively.

As to the first issue, it has long been settled in this Circuit that an antitrust cause of action immediately accrues under the Clayton Act once the "plaintiff feels the adverse impact of [the] antitrust conspiracy." *City of El Paso v. Darbyshire Steel Co.,* 575 F.2d 521, 523 (5th Cir.1978), *cert. denied,* 439 U.S. 1121, 99 S.Ct. 1033, 59 L.Ed.2d 82 (1979), quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 339, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). Where, as here, the rights and liabilities of the plaintiff and defendant were fixed by contract, and the plaintiff claims he has been injured by payments made under the contract, the plaintiff's claim accrues when the parties entered into the contract, even though the payments were made by the plaintiff, and received by the defendant, for years later in fulfillment of the alleged conspiracy. *Id,; accord, Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 715 (11th Cir.1984).

As to the second issue, Plaintiffs agree with Defendants that the *Agency* holding applies here, retroactively. (Plaintiffs Supplemental Memorandum in Response to Defendants' Supplemental Brief on Statute of Limitations Applicable to Federal RICO Claims). However, Plaintiffs argue that the Clayton Act accrual standard should not apply. This Court is not convinced by Plaintiffs' arguments. However, even if

the Court applied a discovery standard as Plaintiffs request, it has already been established that Plaintiffs knew, or *should have known*, at the time of contract, that something was amiss. Accordingly, the statute of limitations for Count IX began to run at the date of contract. Motion for summary judgment as to Count IX is hereby *granted*.

## COUNT X

▇▇▇ In Count X, Plaintiffs assert a claim under Florida's RICO statute, Ch. 895, Fla.Stat. (1985). The relevant limitation period is expressed in § 895.05(10), which states:

> Notwithstanding any other provision of law, a criminal or civil action or proceeding under this act may be commenced at any time within 5 years after the conduct in violation of a provision of this act terminates or the cause of action accrues.

This language appears clearly to provide alternative limitations periods, but it has apparently not been construed in any published opinions. However, this Court declines to attempt to construe this limitations period. Because summary judgment has been granted in favor of Defendants for Counts I through IX, thus eliminating all Federal claims, this Court declines to assert pendant jurisdiction over Count X.

## COUNTS XI and XII

Counts XI and XII are a Prayer for Declaratory Relief, and a Prayer for Equitable Relief. Pursuant to summary judgment having been granted on all preceding counts, except for Count X upon which the Court has declined to exercise pendant jurisdiction, the Court need not address these counts.

## CONCLUSION

It is obvious to this Court that some members of the public have misconceptions about the nature of arms length transactions, and ones own duty to investigate and protect ones interests. From snakes, to the Green Swamp, to representations that buying now means getting rich quick, it is obvious to this Court that no reasonable person could find that the relevant statutes of limitations in this action have not run.

The public policy purpose of statutes of limitation is fairness for all parties concerned. They provide a reasonable time in which a Plaintiff must discover and allege that he has been wronged, while providing that a defendant will not be unfairly hauled into court many years after an alleged wrong has occurred, when a defense would be difficult due to the passage of time.

This Court is reminded of P.T. Barnum's immortal quote, when examining the irrefutable facts presented in this case, *not* that this Court would condone such actions as are alleged in the complaint. However, the law demands that a Plaintiff not sleep on his rights, or close his eyes in stubborn refusal to see the truth, and later complain that he has been tricked and defrauded.

> The limitations period is triggered by the discovery of facts which would cause a reasonable man to inquire whether he has suffered a legal wrong. The plaintiff need only possess a low level of awareness; he need not fully learn of the alleged wrongdoing. Knowledge of all facts is not required to set off the prescriptive clock. Thus, the clock begins to tick when a plaintiff senses "storm warnings" ... not when he hears thunder and sees lightning. *Jensen v. Snellings*, 636 F.Supp. 1305 (E.D.La.1986).

In sum, this Court holds that summary judgment is highly appropriate under the clear facts of this action, in favor of Defendants, on all Counts except Count X, for the reasons stated in this Opinion. Accordingly, it is

*ORDERED* that the motions for summary judgment filed by Defendants are hereby *granted* as to Counts I–IX, and denied as to Count X.

## APPENDIX A

| 1<br>PLAINTIFF<br>NAME | 2<br>PROPERTY*<br>NAME | 3<br>DATE A** | 4<br>DATE B*** | 5<br>DATE C**** |
| --- | --- | --- | --- | --- |
| ARMBRISTER,<br>Herman & Luetta | IA<br>FE | 7/29/77(d)<br>6/21/71(d) | 9/1/77<br>7/22/71 | 12/23/79<br>5/25/79 |
| BAINBRIDGE,<br>Gordon S. | OP | 10/22/70(n) | 11/23/70 | 7/18/72 |
| BIEBER, Harold J.<br>& Delores M. | OP | 7/9/75(d) | 8/15/75 | 5/27/82 |
| FUCHS, Leslie E.<br>& Bettie J. | OP | 5/3/73(d) | 6/10/73 | 4/17/78 |
| GAGNIER,<br>Robert &<br>Marie E. | IA<br>IA<br>FE | 2/24/73(d)<br>7/6/77(d)<br>8/13/71(d) | 3/29/73<br>8/11/77<br>9/14/71 | 3/17/80<br>1/4/84<br>3/25/80 |
| JOHNSON,<br>Milo C. &<br>Gladys J. | IA<br>FE | 7/8/77(d)<br>6/11/71(d) | 8/21/77<br>7/11/71 | 12/24/81<br>12/17/81 |
| LAMBERT,<br>Raymond J. | OP | 11/5/70(d) | 12/13/70 | 9/13/76 |
| LAMBERTSEN,<br>Robert H. | FE<br>FE | 12/16/71(n)<br>5/11/72(n) | 1/12/72<br>6/5/72 | 8/9/77<br>8/9/77 |
| LENTINE,<br>Frances C. &<br>Anita A. | FE<br>FE | 11/29/71(n)<br>8/13/74(d) | 12/22/71<br>9/6/74 | 6/13/80<br>12/10/81 |
| LOCEY,<br>Frederick V. &<br>Edna C. | OP | 6/19/75(d) | 8/1/75 | 3/24/81 |
| LUTZ,<br>Clarence W. &<br>Ruth S. | IA<br>FE | 7/11/77(d)<br>6/22/71(d) | 8/31/77<br>7/17/71 | 8/10/82<br>7/9/79 |
| MACFARLAND,<br>Darell, Grace,<br>Laura K., & Darell | OP<br>OP<br>FE | 1/17/71(d)<br>1/22/71(d)<br>8/2/71(d) | 2/22/71<br>2/28/71<br>8/27/71 | 6/28/84<br>1/12/82<br>5/11/80 |
| MALANKA,<br>Gerald J.,<br>Judith Ann, &<br>Gerald E. | OP<br>IA<br>FE | 5/22/74(d)<br>11/9/77(d)<br>4/30/79(d) | 6/22/74<br>12/11/77<br>6/11/79 | 12/20/76<br>9/2/82<br>1/26/82 |
| MERTENS,<br>Robert C. &<br>Marian J. | OP<br>FE | 11/9/70(d)<br>9/1/71(d) | 12/11/70<br>10/03/71 | 5/26/80<br>5/25/80 |

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| PLAINTIFF NAME | PROPERTY* NAME | DATE A** | DATE B*** | DATE C**** |
| WARE, William H., Sr. | FE | 12/20/71(n) | · 1/13/72 | 7/28/77 |
| | IA | 12/21/77(d) | 1/21/78 | —— |

\* IA–Imperial Acres
  FE–Flagler Estates
  OP–Orlando Pines

\*\*\* Date of First
  Scheduled Payment

\*\* Date Purchase contract was
  signed (d) or notarized (n)

\*\*\*\* Date of Warranty Deed