413 So.2d 1208 (1982)
SCHOOL BOARD OF SEMINOLE COUNTY, Florida, Appellant/Cross-Appellee,
v.
GAF CORPORATION, etc., et al., Appellee/Cross-Appellants.
Nos. 79-457, 80-205 and 80-208.
District Court of Appeal of Florida, Fifth District.
April 14, 1982.
Rehearing Denied May 19, 1982.
*1209 Ned N. Julian, Jr., Sanford, for appellant/cross-appellee.
No appearance for appellee/cross-appellant, GAF Corp.
Stephen D. Feinberg, of Akerman, Senterfitt & Eidson, Orlando, for appellee, Eoghan N. Kelley.
SHARP, Judge.
The School Board of Seminole County appeals from adverse summary judgments in three suits which asserted against Kelley liability for improperly designing or supervising the construction of roofs for three schools in Seminole County. The three schools, Idyllwilde Elementary, Forest City Elementary, and Teague Middle School, were all designed by Kelley and had the same basic roof design. They were built in the same two-year time span (1969-1971), and the roofs of all three schools required extensive repairs and eventual replacement. *1210 The actions were consolidated on appeal because the legal issues and facts involved in all three appeals are basically similar.
The lower court ruled that the four-year statute of limitations[1] applied to these causes of action against Kelley, and that the record showed, as a matter of law, that the School Board discovered or should have discovered the design defects in the roofs more than four years before it filed its lawsuits, in July of 1977. We agree that section 95.11(3)(c) applies to these cases rather than the two-year statute.[2] The language of the four-year statute is much more specifically applicable to these suits against Kelley than the two-year statute, which generally references "professional malpractice" suits.[3] However, we disagree that the record established conclusively, in these cases, that the four-year statute had run against the School Board by July of 1977. Accordingly, we reverse.[4]
In order to sustain a summary judgment holding that a cause of action is barred by a statute of limitations, such as section 95.11(3)(c), the record must conclusively demonstrate that the appellant discovered or should have discovered the injury or the negligent act of the appellee giving rise to the injury. First Federal Savings and Loan Association of Wisconsin v. Dade Federal Savings and Loan Association., 403 So.2d 1097 (Fla. 5th DCA 1981); Mott v. Fort Pierce Memorial Hospital, 375 So.2d 360 (Fla. 4th DCA 1979); Tobin v. Dannheisser, 372 So.2d 970 (Fla. 1st DCA 1979). Further, the reviewing court must draw every possible inference in favor of the party against whom the summary judgment is made. Wills v. Sears, Roebuck & Co., 351 So.2d 29 (Fla. 1977).
In these cases the record established that Kelley was the architect and designer for a number of schools in Seminole County before and after the three included in these law suits. Idyllwilde, Forest City and Teague were designed and supervised in their construction by Kelley and they all had a "round" open-school plan developed by Kelley. All three developed roof leaks during the first two years following completion of construction. These repairs were made by the contractors, under the two-year construction warranties.
In 1973 the warranty period had expired on Idyllwilde, because it was built first, and *1211 the leaks became increasingly severe and persistent at that school. School Board employees conferenced on Idyllwilde's roof with the roofing sub-contractor, resulting in the January 31, 1973 Memorandum from a Mr. Muse (Head of Maintenance) to his supervisor, Mr. Carlton (Head of the School Plants). In the memorandum Mr. Muse said the roof was leaking because:
[T]here were no provisions made in the roof itself to prevent the material from cracking due to expansion.... This problem could be very serious and I am concerned because we have three other schools constructed with practically the same roof design. (He admitted that he was referring to Teague and Forest City).
Kelley's failure to design proper expansion joints in the roof systems was one of the School Board's alleged reasons for the roof "failures" at the three schools. Other correspondence from Mr. Carlton and the admissions in his depositions show he was aware in early 1973 that the roofs on all three schools had severe leaking problems, and he was concerned as to whether or not the defects were covered by the GAF bond on the roofs.
However, from the beginning of the leaks through 1975, the School Board called upon Kelley to handle, coordinate and devise plans to repair the roofs. Repairs were made repeatedly, without cost to the School Board. The record is replete with correspondence during 1973 and 1974 from the School Board to Kelley reporting leaks and problems, and correspondence from Kelley assuring the School Board that the roof problems were being handled and "permanent repairs" were being made under his direction, together with the roof bonding company.[5]
By the end of 1974, the leaks became "critical" and in 1975, School Board employees concluded the roofs required extensive repairs or replacement. More repairs by Kelley and GAF were attempted, but in March of 1976 GAF refused to make any further repairs because GAF claimed the problem was "structural" or design related, and not covered under its bond.
The School Board claimed it was not told by Kelley or GAF that the roof leaks really were caused by "design" or "structural" defects not covered by the bond until March of 1976, although Mr. Carlton admitted he may have been so informed by a GAF representative in 1975. Kelley admitted he knew GAF's position in 1974. He also admitted he realized the School Board was relying on his expertise, knowledge and capacity to resolve the roof problems until 1976. The School Board witnesses also confirmed they had relied on Kelley during that time to determine the cause of the leaks and to repair them. During 1973 and 1974 they were told many possible theories as to why the roofs were leaking.
Under the circumstances as established in this record, where a "client" is relying on a "professional" to resolve and cure a problem within the ambit of their professional relationship, and where the professional continuously works on the *1212 problem and assures the client the problem is being solved, we think it is a question of fact resolvable by a jury, as to when the client knew or should have known his problem was permanent and irreparable. Swagel v. Goldman, 393 So.2d 65 (Fla.3d DCA 1981); Burnside v. McCrary, 382 So.2d 75 (Fla.3d DCA 1980). Had the roof problems been reparable as Kelley assured the School Board they were, the appellant would have had no cause of action against Kelley. The Board's reliance on Kelley as the professional to diagnose and plan the repairs may reasonably have prevented the Board from discovering the permanency of the alleged design defects earlier. We distinguish K/F Development & Investment Corp. v. Williamson Crane & Dozer Corp., 367 So.2d 1078 (Fla.3d DCA 1979), cert. denied, 378 So.2d 350 (Fla. 1979), because that case did not deal with a client-professional relationship. Nor do we conclude that it is necessary for us to adopt the "continuous treatment" doctrine embraced in other states[6] because those principles are already encompassed in Florida's statutory concept of commencing the running of the statute of limitations when an injury is discovered or should have been discovered.
REVERSED.
FRANK D. UPCHURCH, Jr., J., concurs and concurs specially with opinion.
COWART, J., dissents with opinion.
FRANK D. UPCHURCH, Jr., Judge, concurring specially.
While I concur with Judge Sharp, I would go further and recognize the "continuing treatment" doctrine. It is unrealistic to expect a potential claimant, who has engaged a professional, to immediately consider suit when he first discovers an error, omission, or unexpected result, especially, as here, when the professional makes every effort to have the condition corrected. To expect the School Board here to sue their architect on whose judgment and advice they had relied when he was diligently working to have the defective roofs repaired is unrealistic.
These circumstances, in my opinion, are far different from those where the injury or damage is apparent, permanent and unrepairable, although the cause may be uncertain. Aware that his rights have been invaded, it is not unrealistic to impose the burden on the claimant to inquire who, how, and what caused the damage.
COWART, Judge, dissenting:
I respectfully dissent. In Florida the applicable statute of limitations has always been deemed to have commenced to run from the date the cause of action arises. This means the date the plaintiff can first sue for the legal wrong involved. That event can often, if not usually, be identified and determined as a matter of law without the resolution of any genuine issue of fact and, hence, is often properly the subject of a summary judgment.
No rule of law requires that defects resulting from negligence be permanent or non-repairable in order to be actionable. Whether or not a construction deficiency is covered by a bond does not affect the accrual of a cause of action against a negligent party. Likewise, such accrual is not deferred until the party with the cause of action is told about it by the negligent party or the negligence confessed. A leaky roof is not a "latent defect." § 95.11(3)(c), Fla. Stat. (1981). When a newly finished roof leaks it is not only apparent, but obvious, that someone is at fault: the architect, if the design is defective; the roofing contractor, if the installation is defective; the roofing material supplier, if the roofing material is defective, or some combination of them.
The notion that a cause of action against a professional does not accrue so long as the *1213 "client" continues to permit the professional to treat the result of the professional's negligence is a new concept in Florida law and the majority cites no authority for the statement that such "continuous treatment" doctrine has already been adopted as a part of Florida law relating to the accrual of a cause of action and the resultant commencement of the running of the statute of limitations against a "professional." Existing law does not require a client to sue his professional "immediately" after discovering negligently caused injury or damage. Applicable statutes of limitation give either two or, as here, four years within which time the client should either give up on his amiable but bungling professional, get competent help and sue, or be forever barred from asserting his stale claim. Such statutes are proper exercises of legislative prerogative and I would not extend them by judicial action.
If more than a leaky roof is necessary to suggest to the landowner that it may have a cause of action against someone for a construction defect and, as the majority apparently holds, the statute of limitations does not run against a professional until the client subjectively realizes that the injury was caused by the professional rather than some other possible source, then in this case the memorandum from the school's head of maintenance, Mr. Muse, in 1973 serves that purpose when it states that "there were no provisions made in the roof itself to prevent the material from cracking due to expansion." This is a clear reference to the architect's failure to design proper expansion joints in the roof and is, in my opinion, sufficient to sustain the summary judgment. I would affirm.
NOTES
[1] Section 95.11(3)(c), Florida Statutes (1979). provides a four year statute for:

An action founded on the design planning, or construction of an improvement to real property, with the time running from the date of actual possession by the owner, the date of abandonment of construction if not completed, or the date of completion or termination of the contract between the professional engineer, registered architect, or licensed contractor and his employer, except that when the action involves a latent defect, the time runs from the time the defect is discovered or should have been discovered with the exercise of due diligence. In any event the action must be commenced within 12 years after the date of actual possession by the owner, the date of abandonment of construction if not completed, or the date of completion or termination of the contract between the professional engineer, registered architect, or licensed contractor and his employer.
[2] Section 95.11(4)(a), Florida Statutes (1979), provides a two year period in which to file:

An action for professional malpractice, other than medical malpractice, whether founded on contract or tort; provided that the period of limitations shall run from the time the cause of action is discovered or should have been discovered with the exercise of due diligence. However, the limitation of actions herein for professional malpractice shall be limited to persons in privity with the professional.
[3] Carcaise v. Durden, 382 So.2d 1236 (Fla. 5th DCA 1980); Wetmore v. Brennan, 378 So.2d 79 (Fla.3d DCA 1979).
[4] Because of our disposition of these appeals, we decline to consider the appellee's cross-claims which seek review of the trial court's failure to grant Kelley's motion to dismiss for the School Board's failure to prosecute these suits pursuant to Rule 1.420(a). At this juncture these orders are not final, and this court does not have jurisdiction to review them. Bowl America Fla., Inc. v. Schmidt, 386 So.2d 1203 (Fla. 5th DCA 1980); Robertson v. Florida Rock and Truck Lines, Inc., 385 So.2d 138 (Fla. 5th DCA 1980); Fla.R.App.P. 9.130(a)(3); see Greyhound Corp. v. Estevez, 360 So.2d 41 (Fla.3d DCA 1978); Metropolitan Transit Authority v. Porter, 328 So.2d 573 (Fla.3d DCA 1976).
[5] For example:

On April 5, 1973 
Kelley wrote the School Board concerning the roof splitting at Teague:
"This is not considered to be a serious problem and a satisfactory solution has been arrived at by those concerned. This area will be satisfactorily corrected at no cost to the County School Board."
On October 30, 1973 
Kelly wrote to the School Board that the "permanent repairs" had been completed.
On February 11, 1974 
Kelley's office planned further "permanent repairs" to the roofs.
On April 11, 1974 
Kelley assured the School Board he had a person in his office working full-time on the problem. "We request that we continue to be given the opportunity to work hard on this item."
On July 16, 1974 
Kelley reported to the School Board the the repairs were going forward at no cost to the School Board. "I am personally monitoring this progress  to stop all leaks on a permanent basis."
On December 3, 1974 
Kelley reported the repairs at Teague as being complete and said he was going to set up a meeting with the bonding company. "The ... extent of the remaining problem may be less than anticipated by your letter."
[6] See Shaw v. Clough, 597 S.W.2d 212 (Mo. Ct. App. 1980); Naetzker v. Brocton Cent. School Dist., 50 A.D.2d 142, 376 N.Y.S.2d 300 (App. Div. 1975), reversed on other grounds, 41 N.Y.2d 929, 394 N.Y.S.2d 627, 363 N.E.2d 351 (1977); Borgia v. City of New York, 12 N.Y.2d 151, 237 N.Y.S.2d 319, 187 N.E.2d 777 (1962); County of Broome v. Vincent J. Smith, Inc., 78 Misc.2d 889, 358 N.Y.S.2d 998 (Sup.Ct. 1974).