461 So.2d 239 (1984)
The BOARD OF TRUSTEES OF SANTA FE COMMUNITY COLLEGE, Appellant,
v.
CAUDILL ROWLETT SCOTT, INC., et al., Appellees.
Nos. AW-19, AX-340.
District Court of Appeal of Florida, First District.
December 21, 1984.
Rehearing Denied January 22, 1985.
*240 Robert O. Stripling, Jr. and Robert J. Denson of Stripling & Denson, Gainesville, for appellant.
James C. Mize, Jr. of Bull & Neilson, Orlando, for appellees Caudill Rowlett Scott, Inc. William Caudill and Wallie Scott.
Martin J. Mickler of Bullock, Childs, Mickler & Cohen, Jacksonville, for appellee W.W. Gay Mechanical Contractors, Inc.
Charles B. Carter of Jones & Langdon, Gainesville, for appellee Drake Contracting, Inc.
Herbert R. Kanning and Jack W. Shaw, Jr. of Mathews, Osborne, McNatt, Gobelman & Cobb, Jacksonville, for appellee Anderson & Associates, Inc.
Victor M. Halbach, Jr. of Marks, Gray, Conroy & Gibbs, Jacksonville, for appellees Arthur Lee Campbell, Craig H. Salley, Campbell, Salley & Associates, Inc. and Salley/Jackson/Reeger, Inc.
A. Graham Allen of Freeman, Richardson, Watson & Kelly, Jacksonville, for appellee T. Neal Kenyon.
Charles B. Carter of Jones & Langdon, Gainesville, for appellee Charles R. Perry Construction, Inc.
W.C. O'Neal of O'Neal & O'Neal, Gainesville, for appellee Mathews Systems, Inc.
*241 BARFIELD, Judge.
The Board of Trustees of Santa Fe Community College appeals two summary judgments entered in favor of the defendants below in related cases which we consolidated for purposes of this review.
The appellant contends that the trial court erred in determining there were no genuine issues of material fact and ruling as a matter of law that the Statute of Limitations barred the actions of the appellant. We agree and reverse as to both summary judgments. The second issue raised by the appellant is the trial court's denial of its motion to amend its complaints. Our reversal of the summary judgments renders the second issue moot on this appeal.
The issue to be determined by the trial court was whether the appellant knew or should have known of the corroded condition of underground pipes more than four years before August 21, 1981, on which date it filed suit against the architects, mechanical engineers, general contractors, and mechanical contractors involved in the construction of nine campus buildings.
The contract for construction of Buildings A, B, C and D was entered into in 1968; the buildings were occupied by the college in September of 1972. The construction contract for Building E was entered into in 1972; it was occupied by the college in August, 1975. Other campus buildings were also constructed between 1970 and 1979 by appellees and others; construction was substantially completed by the fall of 1979, after which time the contractors were no longer present on the campus.
As early as 1972, sporadic leaks had occurred in the underground piping system. These leaks were reported to the college, but were usually repaired by the contractors already working on campus, and were generally attributed to mechanical failures and breaks normally incident to large, ongoing construction projects. When the constractors left the campus in the fall of 1979, the physical plant department of the college assumed responsibility for repair of the leaks. In November, 1979, while repairing several underground leaks, the college discovered that the metal pipes were corroded and that the soil surrounding the corroded pipes was "gumbo clay".
In April, 1980, the college contacted a mechanical engineer who determined that the damage was caused by galvanic corrosion, which he attributed to the clay surrounding the pipes. Upon the engineer's recommendations, the college retained a metallurgist, Dr. Gould, who examined several pipe failures between April and October, 1980, and recommended a comprehensive survey to determine whether there was a system-wide corrosion problem. On October 26, 1980, the college called a meeting of the architects and contractors regarding the problem with the piping system. When they refused to participate in further study of the problem, the college retained Dr. Gould to conduct the study, which cost $25,682. Dr. Gould's report, issued in March, 1981, concluded that a campus-wide corrosion problem existed in the underground piping system and that it was caused by installation of the piping system in clay. Backfilling of the pipe trenches with clay was determined to be in violation of the specifications for the job.
The twenty-two count complaint included claims for negligence, breach of contract, breach of expressed warranties, and breach of implied warranties. Under each count, the college stated:
That as a direct and proximate result of the [negligence or breach] of Defendants, extensive leaks have occurred throughout the underground piping system which have been caused by extensive pitting and corrosion of said water pipes. Said leaks have occurred at regular intervals following the occupancy date of these buildings by the college, the first of said leaks occurring in [September 1972 (for Buildings A, B, C, D); 1976 (for Building E)] and the last of said leaks occurring in [March, 1981 (for Buildings A, B, C, D); the latter part of 1979 (for Building E)].
*242 The defendants' motions to dismiss based on the Statute of Limitations were denied. In response to interrogatories requesting the date of discovery of the first corrosive leak and all successive corrosive leaks, as well as the precise location of each leak and the material used in the pipe, the college attached a list of 23 pipe failures occurring from September, 1972 to July, 1981. In response to defendants' requests for admissions, the college admitted its awareness of subsurface pipe failures since 1972, but denied knowledge of corrosion in the piping system before November, 1979. The defendants moved for summary judgment, based upon the above-quoted language of the complaint and the responses to the interrogatories and requests for admissions, asserting, "The leaks which are the subject of this action existed and were discovered more than four years prior to the filing of the action." In opposition to the motions for summary judgment, the college filed affidavits of several administrators, as well as the mechanical engineer and the metallurgist who studied the corrosion problem, asserting that the galvanic corrosion was a latent defect which was not discovered until November, 1979, and that the isolated leaks occurring before that date were thought to be normal workmanship problems accompanying any large construction project and were repaired by the contractors, who did not notify the college that there was a permanent problem. The affidavit of Dr. Turner explained that the "leak list" used to answer interrogatories was a list of all leaks which had been compiled to aid in Dr. Gould's study.
The motions for summary judgment were denied, apparently because the trial judge determined that the Statute of Limitations did not apply to the college, a government entity. The college was allowed to amend its complaint to drop and add parties defendant and counts relative to specific buildings. The college was subsequently allowed to amend the complaint to correct the names of two defendant insurance companies.
Defendants' answers to the amended complaint again asserted the Statute of Limitations defense and defendants again moved for summary judgment, asserting that the statute upon which the college relied in the hearing on the previous motion for summary judgment had been repealed, that section 95.11, Florida Statutes, governs this action, that the limitations period ran from the discovery of the leaks in 1972, and that the limitation period had expired prior to the 1981 filing of the suit.
The college filed a memorandum in opposition to the motions for summary judgment, asserting that the motions were premature since discovery was not yet complete, that there had been no significant change in the record since the previous denial of the motions for summary judgment, that the college was not on notice of the corrosion defect until November, 1979, and that a corroding underground pipe system is a latent defect. In subsequent proceedings the summary judgments now under review were entered.
The limitation period for an action founded on the design or construction of an improvement to real property is four years from the date of actual possession or completion of the contract, whichever is later, except that, when the action involves a latent defect, the time runs from when the defect is discovered or should have been discovered with the exercise of due diligence. Section 95.11(3)(c), Florida Statutes. Case law recognizes that the limitations period commences when the plaintiff has been given notice of the invasion of his legal rights, i.e., when he has been put on notice of his right to a cause of action. City of Miami v. Brooks, 70 So.2d 306 (Fla. 1954); Neff v. General Development Corporation, 354 So.2d 1275 (Fla. 2d DCA 1978); Lund v. Cook, 354 So.2d 940 (Fla. 1st DCA), cert. den., 360 So.2d 1247 (Fla. 1978); Smith v. Continental Insurance Company, 326 So.2d 189 (Fla. 2d DCA 1976).
In order to succeed on a motion for summary judgment based upon the Statute of Limitations, the movants in the case at issue were required to conclusively *243 show that there exists no disputed issue of fact with respect to the date of commencement of the limitations period, specifically, that the defect which forms the basis of the cause of action was discovered, or should have been discovered with exercise of due diligence, more than four years before the suit was filed (i.e. prior to August 21, 1977). Whether one by exercise of reasonable diligence should have known he had a cause of action against the defendant is, ordinarily, a question of fact which should be left to the jury. Perez v. Universal Engineering Corporation, 413 So.2d 75 (Fla. 3d DCA 1982); First Federal Savings & Loan Association of Wisconsin v. Dade Federal Savings & Loan Association, 403 So.2d 1097 (Fla. 5th DCA 1981); Tobin v. Dannheisser, 372 So.2d 970 (Fla. 1st DCA 1979); Walker v. Dunne, 368 So.2d 640 (Fla. 2d DCA 1979); Schetter v. Jordan, 294 So.2d 130 (Fla. 4th DCA 1974). After reviewing the entire record, we conclude that at the time of the hearing on the motions for summary judgment there existed a genuine issue regarding whether the college had discovered, or by diligence should have discovered, the corroded pipes which are the basis of its cause of action more than four years before the filing of its complaint. This issue of fact should have been determined by the trier of facts, and not resolved by summary judgment.
It is undisputed that leaks occurred in the underground piping system prior to August, 1977, and that the college was aware of these leaks. There appears to be some dispute regarding whether the college repaired any of the leaks prior to November, 1979 and whether the college had uncovered corroded pipes before the fall of 1979. We find no evidence in the record that indicates that any of the pre-1979 leaks were caused by corroded pipes, although the causes of some of the leaks have not as yet been determined (none of the contractors or engineers involved in the construction and only a few of the college personnel who would have knowledge of the leaks have been deposed at this time).
The appellees assert that by attaching the "leak list" to its response to interrogatories, the college has admitted that the leaks which occurred from September, 1972 were corrosion leaks. However, it should be noted that the affidavits in opposition to the motions for summary judgment established that this list evolved from earlier lists compiled to assist in the study of the problem and included all the leaks of which the college was aware. Examination of the record discloses that there were at least five such lists, that of the approximately 17 leaks discovered before November, 1979, at least 6 were plastic pipes (which are not subject to galvanic corrosion), and that at least three of the other leaks were caused by pipes "splitting", "bursting" due to a water hammer effect, or being damaged by heavy equipment during construction. This is in contrast to the 27 leaks discovered after November, 1979, 18 of which were caused by corrosion, three by stress fractures, one by the union of dissimilar metals and five due to unknown causes.
Appellant correctly points out that on a motion for summary judgment, all reasonable inferences must be drawn in favor of the nonmoving party. The lack of evidence of corrosion before November, 1979, coupled with the observation that corrosion is an ongoing process that may take many years to manifest itself, allows a reasonable inference that the leaks which occurred prior to August, 1977 were not due to corrosion. It follows that the college could not have been put on notice by such leaks that a cause of action existed for corroded pipes resulting from negligent backfilling of the pipe trenches.
Appellees assert that a letter from the "clerk of the works", O.D. Thomas, notified the college as early as 1976 that a system-wide problem may have existed. However, appellant points out that Thomas' deposition explains that the leak to which he was referring was a mechanical failure, not corrosion, that he was unaware at the time of any corrosion problem, and that he suspected a manufacturing defect in the pipe, not improper installation as is alleged in the complaint.
*244 Appellees contend that it is the discovery of the leaks, and not discovery of the corrosion which caused the leaks, which commences the statutory limitations period, citing Kelley v. School Board of Seminole County, 435 So.2d 804 (Fla. 1983), which overrules School Board of Seminole County v. GAF Corporation, 413 So.2d 1208 (Fla. 5th DCA 1982), upon which appellant had relied in the trial court. Appellees also cite Havatampa Corporation v. McElvy, Jennewein, Stefany and Howard, Architects/Planners, Inc., 417 So.2d 703 (Fla. 2d DCA 1982), pet. for rev. den., 430 So.2d 451 (Fla. 1983) and K/F Development & Investment Corporation v. Williamson Crane & Dozer Corporation, 367 So.2d 1078 (Fla. 3d DCA), cert. den. 378 So.2d 350 (Fla. 1979). However, as the Kelley court noted (in footnote 3), that case did not present the question of whether a cause of action actually existed or whether the school board had, or should have, discovered the existence of a problem. The Supreme Court's holding in Kelley was a rejection of the "continuous treatment" doctrine which the majority had adopted in the DCA opinion.
In contrast, the instant case presents genuine issues regarding whether (1) a cause of action existed prior to August, 1977 (whether any of the pre-1977 leaks were due to corrosion) and (2) whether the college had, or should have, discovered the existence of the corrosion prior to August 21, 1977 (four years before the suit was filed). We find the trio of "roof leak" cases cited by appellees distinguishable from the instant case in several other ways as well: "roof leaks" which occur as soon as the roof is finished indicate that either the architect, the roofing contractor, or the material supplier is at fault; "leaky pipes" may be due to a variety of accidents or failures completely unrelated to corrosion caused by improper backfill (improper connections, damage by heavy vehicles or later excavation, a "water hammer effect", defectively manufactured pipe, etc.); defects in underground water pipes are not as easily detectable as defects in a roof, which become apparent after every rainstorm. We further note that Dr. Turner's affidavit explaining the nature of the "leak list" attached in answer to interrogatories was a credible explanation of the seeming discrepancies in the record as to the dates on which corrosion caused leaks were known.
The summary judgments are REVERSED and the cause is remanded for further proceedings.
JOANOS and WIGGINTON, JJ., concur.