Grecia "Mimi" M. KORMAN, Plaintiff,

v.

Julio IGLESIAS, Defendant.

No. 90–0119–CIV.

United States District Court,
S.D. Florida, Miami Division.

June 23, 1993.

Alyssa Reiter, Hicks, Anderson & Blum, P.A., Miami, FL, Murray Sams, Jr., Law Offices of Murray Sams, Jr., Coral Gables, FL, for plaintiff Korman.

William F. Hamilton, Juan C. Enjamio, Holland & Knight, for defendant Julio Iglesias.

## ORDER (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND (2) DENYING PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

MORENO, District Judge.

THIS CAUSE came before the Court upon the Defendant's Motion for Summary Judgment, the Plaintiff's Cross–Motion for Summary Judgment, and the Report and Recommendation of U.S. Magistrate Judge Barry L. Garber.

THE MATTER was referred to the Honorable Barry L. Garber, United States Magistrate Judge. A Report and Recommenda-

tion dated April 27, 1993 has been filed, recommending that the Defendant's Motion for Summary Judgment be granted and the Plaintiff's Cross–Motion for Summary Judgment be denied. Objections to the report have been filed.

THE COURT has conducted a *de novo* review of the entire record and has been otherwise fully advised in open court. The court finds that the Plaintiff's claims for fraud, civil theft, and constructive trust are barred by the applicable statutes of limitations, as explained fully in Judge Garber's Report and Recommendation. Accordingly, it is

ADJUDGED that United States Magistrate Judge Barry L. Garber's Report and Recommendation is AFFIRMED in its entirety. Based on the report, the objections are OVERRULED. The Defendant's Motion for Summary Judgment is GRANTED, and the Plaintiff's Cross–Motion for Summary Judgment is DENIED.

## REPORT AND RECOMMENDATION

GARBER, United States Magistrate Judge.

THIS CAUSE is before the Court pursuant to an Order of Reference entered in this cause on April 27, 1993. The following Report and Recommendation is submitted on the defendant's, Julio Iglesias ("Iglesias"), motion for summary judgment and the plaintiff's, Grecia "Mimi" Korman ("Korman"), cross motion for summary judgment.

## BACKGROUND

Korman filed suit against Iglesias for fraud, civil theft and constructive trust on January 16, 1990.[1] Korman alleges that in May 1978 Iglesias asked her to write a Spanish adaption of a French song, "J'ai Oublié de Vivre". (Compl. at ¶ 6). Iglesias allegedly represented that his publisher was in the process of securing a contract from the French publisher and promised to pay Kor-

---

1. The complaint was amended in May 1990 pursuant to United States District Judge James Lawrence King's Order of May 10, 1990 Denying In Part And Granting In Part Defendant's Motion To Dismiss and allowing leave to amend and refile upon Korman's compliance with § 772.11, Florida Statutes, which requires that prior to bringing an action for civil theft that the plaintiff make a written demand for payment to the defendant.

man a percentage of the royalties for the Spanish version of the song. *Id.* at ¶ 7.

Korman wrote Spanish lyrics for the French song, titled it "Me Olvidé de Vivir" (the "song") and delivered the lyrics to Ramon Arcusa, Iglesias' music director. *Id.* at ¶ 8. Korman alleges that in October 1978 Enrique Garea ("Garea"), the director of Iglesias' Spanish recording company, presented her with a contract securing her royalties for the Spanish lyrics she wrote for the song. *Id.* at ¶ 9. The parties to the contract were Korman and Star Music, a music company of which Iglesias was a principal, and the contract provided for Korman to assign all of her rights to the song in return for a percentage of the royalties. *Id.* at ¶ 10; (*See* Korman Depo. at pg. 309). Korman alleges that at the time she executed the contract, which had not been executed by Star Music, that Garea was to take the contract to Spain to have it executed by Star Music and registered with the Spanish Authors Society and that he would mail Korman a copy. (Compl. at ¶ 11; *See* Korman Depo. at pg. 191). Korman did not keep a copy of the contract. (Compl. at ¶ 11). The song was released in 1979 and included Korman's original title as well as a significant portion of her lyrics. *Id.* at ¶ 13. Korman alleges the song has been released on phono albums, audio cassettes, laser discs and video cassettes and in printed lyric sheet form and is still distributed worldwide. *Id.* at ¶ 14. In most of the releases, Korman is credited as one of the authors of the song. *Id.* at ¶ 13. Korman alleges that she has not received any of the royalties or compensation for the song. *Id.* at ¶ 14.

Between 1979 and 1987 Korman inquired about the status of both the contract and the royalties. *Id.* at ¶ 15; (*See* Korman Depo. at pg. 225). In February 25, 1979, Korman wrote a letter to Garea inquiring about the contract. (Korman Depo. at pg. 225). Korman did not receive any response and unsuccessfully attempted to reach Garea in 1981, 1982, 1983 and 1984. *Id.* at pgs. 191, 193. In 1980 Korman spoke with Iglesias who told her not to worry about her royalties as she

had signed a contract with Garea and that "these things take time...." *Id.* at pg. 193. Korman inquired from Garea about the contract in either 1984 or 1985 to which he responded that he did not remember anything about the contract. *Id.* at pg. 194. In January 1985 Korman wrote a letter to Garea inquiring as to royalties and the contract and in February 1985 received a written response from Garea which reads, in pertinent part:

> About the information you requested, I really don't know what you're referring to since the song "Me Olvidé de Vivir"— recorded by Julio Iglesias—originally belongs to a French publisher, as it really is a French work, and the publisher in Spain is Ediciones Star, and whatever royalties it might have earned must have been paid by the Society General of Authors in Spain (S.G.A.E.) to the respective parties and if you appear in the Spanish lyrics they must have paid you, or remain in deposit pending claim in S.G.A.E.
>
> This record is not part of our catalog, it is owned by CBS, so I assume that CBS, in Miami, might be able to better inform you.

*Id.* at Ex. 9.

Korman estimated that she began in 1980 to inquire about the royalties from various entitles and estimated that she had made approximately 50 or 60 inquiries, both written and oral. (Korman Depo. at pgs. 68, 69). One of these entities was the American Society of Composers, Authors and Publishers ("ASCAP"), which sends its members distribution sheets[2] that reflect the songs on which royalties have accrued and also distributes the royalties to the members. *Id.* at pgs. 47–51. Korman has been a member of the ASCAP since 1972. *Id.* at pg. 47. In 1980 Korman became aware that the song had her credits and inquired to the ASCAP about royalties. The ASCAP told Korman that she would have to index the song with them. *Id.* at pg. 69. Korman indexed the song in both 1980 and in 1990. *Id.* at pg. 66. Between 1980 and 1990 Korman received the distribution sheets from the ASCAP which

---

**2.** The distribution sheets list royalties by song and are regularly sent to the members. (Korman Depo. at pgs. 46–50).

did not reflect any royalties accruing to Korman for the song. *Id.* at pgs. 66–67. In 1992 for the first time Korman received a royalty for the song. *Id.* at pg. 67.

In 1980 and 1981 the song was being played both domestically and internationally and at this time Korman believed she was entitled to royalties for the song. *Id.* at pg. 73. In addition to Iglesias, Garea and the ASCAP, Korman made inquiries between 1980 and 1985 to the Spanish society, CBS (who had acquired the rights to Iglesias' songs), Disco CBS, the French Society of Composers and Authors and Publishers and the Harry Fox Agency as she felt that she should have received royalties. *Id.* at pgs. 214–217, 258. Korman states that despite her inquiries to these entities, she never received an answer as to the status of the royalties. *Id.* at pgs. 215, 263. In 1986 Korman spoke to Iglesias, who was surprised that she had not received any of the royalties and told her to meet with him at a studio. *Id.* at pg. 212. When Korman went to the studio, Iglesias gave her his phone number and said to call him at home; however, when Korman called Iglesias at his home she was not able to speak with him. *Id.* at pg. 213.

In January 1987, SGAE, Society General of Authors in Spain, informed Korman that Garea and Star Music had signed a sub-publishing contract with the French publisher which credited Iglesias as the sole author of the song and advised her that the final word on her royalties would have to come from the French society. *Id.* at Ex. 18. Korman retained counsel who received information from the French Composers' Society on July 6, 1988 stating that according to documentation received from the SGAE that the author of the song was Iglesias. *Id.* at Exs. 20–21. On July 14, 1988, Korman first saw a copy of the musical adaptation contract that Iglesias and Garea filed with the publishers, which was not the contract that she had signed, and listed Iglesias as the author. *Id.* at pgs. 315–16; Ex. 27.

Iglesias seeks summary judgment on the claims for fraud, civil theft and constructive trust on the bases that these claims are

barred by the statute of limitations. Korman seeks summary judgment on the applicability of the statute of limitations to the civil theft claim.

## DISCUSSION

### I. STANDARD OF REVIEW

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is mandated

> after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 321, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The standard for summary judgment is that of a directed verdict, "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citing *Brady v. Southern R. Co.,* 320 U.S. 476, 479–80, 64 S.Ct. 232, 234, 88 L.Ed. 239 (1943)). Further, a "party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.,* 477 U.S. at 256, 106 S.Ct. at 2514.

### II. STATUTES OF LIMITATION

#### A. Fraud and Constructive Trust

Iglesias contends that the statute of limitations bars the claims for fraud and constructive trust [3] since Korman was on notice by 1980, or 1981 at the latest, of a possible invasion of her legal rights. Korman argues that she did not have enough notice to begin the limitations period until 1988 when she received a copy of the contract designating Iglesias as the author of the song.

Pursuant to Florida law, claims for fraud and its derivative claims must be brought

---

**3.** The parties admit that the fraud and constructive trust claims are governed by the Florida four year statute of limitations. *See* Fla.Stat. § 95.-11(3)(j) (1991).

within four years. Fla.Stat. § 95.11(3)(j) (1991). The time within which a fraud action must be commenced begins to run "from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence...." *Id.* at § 95.031(2). The "discovery rule", as articulated by the Florida Supreme Court, holds that:

> 'The statute of limitations attaches when there has been notice of an invasion of the ·legal right of the plaintiff or he has been put on notice of his right to a cause of action ...[.] The statute must be held to attach when the plaintiff was first put on notice or had reason to believe that her right of action had accrued.'

*Florida Power & Light Co. v. Allis–Chalmers Corp.,* 29 E.R.C. 1486, —— (S.D.Fla. 1989) (quoting *City of Miami v. Brooks,* 70 So.2d 306, 309 (Fla.1954)). Discovery of the facts sufficient to trigger the limitations period is determined by an objective standard and " 'means knowledge of facts which would have been discovered in exercise of due diligence'; ...." *Matthews v. Matthews,* 222 So.2d 282, 284 (Fla. 2d Dist.Ct.App.1969). The type of notice to trigger the limitations period is when a plaintiff had " 'notice· of the possible invasion of his legal rights'[ ] [citations omitted] [and] [f]or this purpose it was not necessary· that plaintiff know of all elements of his alleged cause of action, specifically ... the element of fraudulent intent...." *Breitz v. Lykes–Pasco Packing Co.,* 561 So.2d 1204, 1205 (Fla. 2d Dist.Ct. App.1990) (quoting *Jackson v. Georgopolous,* 552 So.2d 215, 216 (Fla. 2d Dist.Ct.App. 1989)), *rev. den.,* 576 So.2d 285 (Fla.1990).

Korman claims the question of whether she knew, or reasonably should have known, of the alleged fraud prior to 1986 is a question of fact for the jury and is not appropriate for summary judgment. While some courts have found issues of fact precluding summary judgment on whether the statute of limitations was a bar to suit, *see, e.g., Puchner v. Bache Halsey Stuart, Inc.,* 553 So.2d 216 (Fla. 3d Dist.Ct.App.1989) (genuine issue of material fact whether through due diligence investor should have discovered fraud); *Board of Trustees of Santa Fe Community College v. Caudill Rowlett Scott, Inc.,* 461 So.2d 239 (Fla. 1st Dist.Ct.App.1984), *rev. den.,* 472 So.2d 1180 (Fla.1985), others have granted summary judgment on the expiration of the statue of limitations. *Compare Florida Power & Light,* 29 E.R.C. at —— (granting summary judgment and concluding that undisputed activities were sufficient to put plaintiff on notice of an invasion of legal rights ·to trigger statute of limitations); *Hynd v. Ireland,* 582 So.2d 772 (Fla. 4th Dist.Ct.App.1991) (summary judgment granted on claim for fraud as barred by statute of limitations); *Calder v. Uwanawich,* 449 So.2d 911 (Fla. 3d Dist.Ct.App.1984) (same); *Codding v. Phillips,* 296 So.2d 554 (Fla. 3d Dist. Ct.App.) (issue of whether or not facts were sufficient to have discovered fraud was a legal question), *cert. den.,* 304 So.2d 125 (Fla. 1974); *Matthews,* 222 So.2d at 284 (same). Accordingly, this Court will examine the evidence to determine if there are issues of material fact as to when Korman knew, or should have known, of the invasion of her legal rights.[4]

■ Iglesias contends that the statute of limitations began to run in 1980 or· 1981 as at this time Korman knew that she was not receiving royalties and that they were overdue. Korman responds that even though she knew the royalties were overdue, that she was not aware until 1988 that she had been

---

4. Korman makes much of Judge King's Order denying the· motion to dismiss the fraud, constructive trust and civil theft claims based on the statute of limitations. Judge King held that under the applicable standards for a motion to dismiss, even though Korman knew more than four years ago that she was not receiving royalties, "whether that knowledge constituted facts which revealed fraud remains a question of fact which this court must resolve in favor of plaintiff *on a motion to dismiss.*" *Korman v. Iglesias,* 736 F.Supp. 261, 265–66 (S.D.Fla.1990) (emphasis added). In so holding, Judge King noted that Korman alleged in her complaint that she did not discover that Iglesias had defrauded her until 1988 and that for purposes of a motion to dismiss, these facts must be accepted as true. *Id.* at 263, 265. Nonetheless, this Court is not bound ·by the same standard on a motion for summary judgment; therefore, Judge King's prior order does not preclude this Court from ascertaining whether Korman had sufficient knowledge based on the record to trigger the limitations period.

defrauded and that the lack of payment could have been attributable to many parties. In essence, Korman argues that she did not know she was injured until 1988, did not have notice of the source of the injury and that the statute of limitations was not triggered as her repeated attempts to obtain this knowledge were met with assurances that such royalties were forthcoming. However, while all elements of an action for fraud must exist before an action may be maintained, the limitations period begins to run when a plaintiff has notice of the " 'possible invasion of his legal rights' " and it is not imperative that the plaintiff know of all elements of the cause of action; however, all elements must exist prior to the running of the statute of limitations. *Hynd*, 582 So.2d at 773 (quoting *Breitz*, 561 So.2d at 1205). The undisputed facts in this cause establish that Korman was on sufficient notice to start the limitations period prior to 1986.

Korman's deposition testimony reveals that as of 1980 she was on notice that the royalties were overdue. Korman testified that the reason she began making inquiries in 1980 of ASCAP was "[b]cause I was at the time asking, you know, if I should get any of the royalties of the song at that point. And they told me—I figured, you know, I should get it because it had my credits. They told me you have to index the song. That's the time I indexed the song." (Korman Depo. at pg. 69). After Korman indexed the song, she never received royalties and continued to make inquiries in 1980 and 1981 believing that she was entitled to royalties which were overdue. Further, Korman had received royalties from other songs prior to 1980 and never before had to wait so long to receive royalty payments for a domestic song. During 1980 and 1981 while Korman was making inquiries as to her royalties, the song was being played both domestically and internationally. Korman stated that she began making inquiries in 1980 and 1981 as she

should have received some royalties by this time. *Id.* at pgs. 73, 74. Besides making inquiries to the ASCAP in 1980 and 1981, she was "making inquiries, period, about royalties here and everywhere." *Id.* at pg. 73. While, Korman contends that she was assured by Iglesias in 1980 that royalties would be forthcoming, she admits that she was already aware that the royalties were overdue at this time. *Id.*[5] The evidence reflects that Korman was on notice that she had been wronged prior to 1986.

Despite the contention that Korman never received a definitive answer from these inquiries, it is not necessary that she actually know of the alleged fraudulent intent to begin the running of the statute of limitations; rather, it is sufficient that she "had notice of the alleged injury, and of the transaction involving defendant resulting in the injury." *Breitz*, 561 So.2d at 1204. Even though Korman claims that she did not know of the injury until she actually learned of the contracts designating Iglesias as the sole author until 1988, the facts show that Korman knew as early as 1980 that she was not being paid royalties, that she knew she was entitled to royalties and that they were overdue. *See Hynd*, 582 So.2d at 773 (holding it was "not necessary that the exact amount of damages be foreseeable to have a cause of action"; instead, it was enough that there was an injury sustained as a result of a wrongful act and that the law afforded a remedy). Thus, the Court concludes that the undisputed facts reveal that Korman had sufficient knowledge to trigger the limitations period prior to filing suit in 1986.

Further, Korman as early as 1979 inquired from Garea on the whereabouts of the contract[6] and repeatedly attempted to contact him in 1982, 1983 and 1984. At this point, Korman was reasonably on notice of a possible invasion of her legal rights having not received either a copy of the contract execut-

**5.** Even if the reassurance by Iglesias could have tolled the limitations period, it is undisputed that Korman continued after such assurance to inquire from various sources as to the whereabouts of the royalties from 1980 until 1985.

**6.** Korman's letter reads, in pertinent part:

Where is the copy of the contract? Did you 'forget' to send it? I hope th[a]t registration with the society is not a lengthy process.
I am asking you to send this to me as soon as possible because it's no small thing to write a song for Julio and not to have the contract. (Korman Depo. at Ex. 7).

ed in 1978 or the overdue royalties as of 1980 or 1981.[7] Korman stated that she had entered into other similar contracts which were registered with the S.G.A.E. in Spain and that these contracts were sent back to her within one month after they were registered. (Korman Depo. at pgs. 230–234). Korman also stated that when she wrote the letter to Garea in 1979 that she expected to have received a copy of the contract by that time as four or five months had passed since she had executed it. *Id.* at pgs. 234–235. The fact that Garea in 1985 responded that he had no knowledge of the alleged contract only adds to the undisputed facts that Korman had sufficient knowledge prior to this time to begin the limitations period. Even if it can be construed that Korman was not on notice of a possible invasion of her legal rights prior to 1985, which this Court concludes that she was, Garea's denial of any knowledge regarding the existence of the contract allegedly entered into seven years prior would be sufficient to trigger the limitations period as at this point Korman should have been on notice of a possible invasion of her legal rights.

In addition to the findings above, the Court notes that Korman authored other songs prior to the adaption of "Me Olvidé de Vivir" for which she received royalties from ASCAP which evinces Korman's knowledge and familiarity with the process of obtaining royalties. Further, Korman admits that she has never had to wait so long for domestic royalties. (Korman Depo. at pgs. 50–52, 58, 70). Korman also admitted that she reviewed the ASCAP distribution sheets for royalties on the song after she indexed it in 1980. *Id.* at pg. 70. Thus, Korman either knew, or should have known, that there was something amiss with the transaction prior to 1986.

Based on the totality of the undisputed facts, the Court concludes that Korman had sufficient knowledge of her legal rights to trigger the statue of limitations more than

four years prior to bringing suit in this cause. *See Moneyhun v. Vital Industries, Inc.,* 611 So.2d 1316, 1322 (Fla. 1st Dist.Ct.App.1993) (holding defendant's statements that he could not pay the plaintiff, "that he did not have the money to pay him, and that the project had cost too much, in conjunction with ... [his] repeated refusals to sign an agreement ... constituted sufficient notice" to the plaintiff to exercise due diligence to determine whether he would be paid); *see also Sands v. Blando,* 575 So.2d 1306 (Fla. 3d Dist.Ct.App. 1991) (stating combination of facts were sufficient for determination that as a matter of law plaintiff should have discovered the fraud).[8]

### B. Civil Theft

■ Iglesias seeks summary judgment on the claim for civil theft on the basis that this claim is barred by the statute of limitations while Korman seeks summary judgment that this claim is not so barred.

Civil theft claims are governed by the statute of limitations contained in § 772.17 which provides that:

> Notwithstanding any other provision of law, a civil action or proceeding under this chapter may be commenced at any time within 5 years after the conduct in violation of a provision of this act terminates or the cause of action accrues.

Fla.Stat. § 772.17 (1991). The civil theft claim is based on Iglesias' wrongful deprivation of the royalties and not, as Iglesias contends, for the deprivation of Korman's intellectual work product. Korman argues that the civil theft claim is timely as the royalties continue to accrue to this day which, in effect, precludes the running of the statute of limitations as long as the wrongful deprivation continues. Korman also relies on Judge King's prior order denying the motion to dismiss and stating that as long as the wrongful deprivation of the royalties contin-

---

**7.** Korman's prior dealings with Garea involved a negotiation of a tape and other communications concerning items he wanted Korman to include in her column while she was a reporter for the Billboard. (Korman Depo. at pgs. 182, 209). The Court does not find facts to support a fidu-

ciary relationship between Korman and Garea to toll the statute of limitations.

**8.** The conversation with Iglesias in 1986 does not toll the limitations period as this Court finds that it began to run prior to this alleged conversation.

ues, the civil theft has not terminated and that the limitations period has not run. (Pl's Memo. in Opp. to SJ and Cross Mtn for SJ at pg. 10). However, as already discussed, Judge King's Order did not make findings of fact and construed the allegations as true only in deciding whether a cause of action was stated or not. *See supra note 4.*

The Court rejects Korman's argument that as long as the song is generating royalties that the limitations period has not run. To adopt this reasoning would be to hold that as long as royalties accrue, such as twenty years from now in the event the song is being played, sold, etc., that suit could be brought. Such a result cannot be the intent of the legislature in enacting § 772.17. "The purposes of the statutes of limitations are to protect defendants against unusually long delays in filing of lawsuits and to prevent unexpected enforcement of stale claims concerning which interested persons have been thrown off guard for want of reasonable prosecution." *Nardone v. Reynolds,* 333 So.2d 25, 36 (Fla.1976). Also, in *Armbrister v. Roland Intern. Corp.,* 667 F.Supp. 802 (M.D.Fla.1987) the plaintiffs claimed civil theft for the defendants knowingly obtaining of the plaintiff's monthly payments for their investment contracts. In determining whether the defendants had committed civil theft, the court construed § 812.035(10), Florida Statutes (1985), a predecessor to § 772.17, which provided a five year limitations period after the cause of action accrued. *Id.* at 822. The court held that a cause of action accrued for civil theft when the last element constituting the cause of action accrued and that the plaintiff's claim arose, and the limitations period commenced, when the injury first occurred—when the plaintiffs made the first payments to the defendants or contracted to do so. *Id.* The fact that *Armbrister* construed a predecessor statute to § 772.17 is inconsequential as the language of § 772.17 mirrors that of § 812.035(10) as both provide that suit must be commenced within five years after the cause of action accrues while § 772.17 provides an alternative time for the statute to run—when the conduct terminates. The holding in *Armbrister* is also consistent with Florida law that a cause of action accrues when there has

been an injury; regardless of how slight. *See Hynd,* 582 So.2d at 773. The injury in this cause occurred when Korman first became entitled to royalties and they were not received. According to Korman, this time period would have been in at least 1980 or 1981 at which time they were overdue.

Korman argues that the "discovery rule" applies to § 772.17 so that the limitations period does not run until she knew or should have known of the civil theft. Without deciding whether the discovery rule applies to § 772.17, *see Jones v. Childers,* 1992 WL 300845 (M.D.Fla. June 26, 1992) (stating discovery rule may apply to § 772.17), this Court concludes that Korman was on notice, or should have reasonably been on notice, of the possible invasion of her legal rights prior to 1985. *See Armbrister,* 667 F.Supp. at 822 (disputing that discovery rule applies to accrual language in civil theft statute and finding that even under discovery rule the plaintiffs were on notice of theft at time they signed their contracts). The undisputed facts evince that Korman was on notice, or should have been on notice, of the wrongful deprivation prior to 1985 as she was aware that the royalties were overdue. Thus, this cause is barred by the statute of limitations.

## CONCLUSION AND RECOMMENDATION

Based on the foregoing, the undersigned concludes that there is no issue of material fact that Korman was on sufficient notice to trigger the statute of limitations for the fraud, constructive trust and civil theft claims prior to 1985. Accordingly, the undersigned hereby

RECOMMENDS that summary judgment be GRANTED for the defendant, Julio Iglesias, on Count I for Fraud, Count II for Constructive Trust and Count III for Civil Theft and that summary judgment be DENIED for the plaintiff, Grecia "Mimi" Korman, on Count III.

The parties have ten days from the date of this Report and Recommendation within which to file written objections, if any, with the Honorable Federico A. Moreno, United States District Judge. *See* 28 U.S.C. § 636

(1991). Failure to file timely objections mar bar the parties from attacking on appeal the factual findings contained herein. *LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir.), *cert. den.*, 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988).

RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida this 27th day of April, 1993.